# GREENE COUNTY OYER AND TERMINER.

## THE PEOPLE agt. JOSEPH WALTZ.

The charge of the judge in this important case, upon the subjects involved in it, and the law as laid down and made applicable thereto, is divided into the following general headings:

1. What is murder? 2. Justifiable homicide. 3. Excusable homicide. 4. Manslaughter. 5. Murder in the first degree. 6. Murder in the second degree. 7. Facts of the killing. 8. What is insanity? 9. Prominent facts proved on the part of the prisoner. 10. People's evidence. 11. Submission of the case to the jury.

*March*, 1874. -

THE prisoner was indicted for the murder of Herman Holcher. The homicide was committed in May, 1873. The trial took place at Catskill, in March, 1874, and resulted in a conviction of murder in the first degree. The prisoner was executed May 1, 1874, and on the day previous to the execution killed his keeper (Mr. Ernst) in an attempt to escape.

Previous to the execution the prisoner was carefully examined by Drs. Gray and Ordronaux (done by order of Gov. John A. Dix), who reported him perfectly sane, and that his alleged insanity was feigned.

The present statute defining murder, and dividing it into two degrees, was passed subsequent to the homicide, and the charge will be understood as referring to the previous statute.

*District Attorney Crowell & A. C. Griswold*, for people.

*Osborn & Givins*, for prisoner.

### CHARGE OF JUDGE WESTBROOK.

*Gentlemen of the Jury.*— We are approaching the close of a drama in real life which is not often surpassed in interest

by the creation of the imagination. Its final scene, in which you are chief actors, demands of you, and each of you, all your wisdom, all your conscientiousness, and all your firmness. The gravity of your responsibility is very great. On the one hand the people have a right to insist, in case of the guilt of the prisoner, for the protection of life, that "whoso sheddeth man's blood, by man shall his blood be shed, for in the image of God made he man," and on the other hand, the prisoner and humanity have a right to require that the extreme penalty of the law shall not be inflicted except in a clear case, free from all reasonable doubt. In the discharge, gentlemen, of this great and high duty, I invoke for you, and I ask each of you to invoke for yourselves, the source of all wisdom, to give you the wisdom to decide this solemn issue aright.

### What is Murder?

The prisoner, Joseph Waltz, is indicted for the crime of murder. In order that you may intelligently determine whether he is guilty or not guilty of this terrible accusation, I will, in the first place, proceed to explain to you what murder is — what constitutes the crime of homicide in all its various grades. Murder, in the first degree, is thus defined by statute:

"Such killing, unless it be manslaughter, or excusable or justifiable homicide, as hereafter provided, shall be murder in the first degree, in the following cases:

"1. When perpetrated from a premeditated design to effect the death of the person killed, or of any human being."

It is under this subdivision I suppose the prosecution will insist (if under any), that the prisoner is to be convicted.

"2. When perpetrated by any act imminently dangerous to others, and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual.

"3. When perpetrated in committing the crime of arson in the first degree."

These are the statute definitions of this crime, of which I shall have occasion presently to speak when I shall have read to you the various definitions of murder in the second degree, of justifiable and excusable homicide and manslaughter in its degrees. Murder in the second degree is thus defined:

"Such killing, unless it be murder in the first degree, or manslaughter, or excusable or justifiable homicide, as hereinafter provided, or when perpetrated without any design to effect death, by a person engaged in the commission of any felony, shall be murder in the second degree."

You will observe, from the definition of the crime of murder in the second degree, that the statute declares every homicide to be of that degree of crime, "unless it be murder in the first degree or manslaughter, or excusable or justifiable homicide." It will be necessary for me, therefore, to define to you excusable and justifiable homicide, and the various degrees of manslaughter. There is no pretense in this case that this is a case of justifiable homicide, but still it becomes important that you understand it, that you may be able rightfully to comprehend what is murder.

### Justifiable homicide.

"Such homicide is justifiable when committed by public officers, and those acting by their command in their aid and assistance, either, 1. In obedience to any judgment of a competent court, or, 2. When necessarily committed in overcoming actual resistance to the execution of some legal process, or to the discharge of any other legal duty; or, 3. When necessarily committed in retaking felons who have been rescued, or who have escaped; or, 4. When necessarily committed in arresting felons fleeing from justice."

Such homicide is also justifiable when committed by any person in either of the following cases:

"1. When resisting any attempt to murder such person, or to commit any felony on him or her, or upon or in any dwelling-house in which such person shall be."

That is the great law of self-defense which we all understand; the defense either of ourselves or our property.

" Or, 2. When committed in the lawful defense of such person, or of his or her husband, wife, parent, child, master, mistress, or servant, when there shall be a reasonable ground to apprehend a design to commit a felony or to do some great personal injury, and there shall be imminent danger of such design being accomplished; or, when necessarily committed in attempting, by lawful ways and means, to apprehend any person for any felony committed; or in lawfully suppressing any riot, or in lawfully keeping and preserving the peace.

### Excusable homicide.

Then comes excusable homicide:

" Such homicide is excusable when committed, 1. By accident and misfortune in lawfully correcting child or servant; or in doing any other lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent; or, 2. By accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation, or upon a sudden combat, without any undue advantage being taken, and without any dangerous weapon being used, and not done in a cruel or unusual manner."

### Manslaughter.

Then follow the various degrees of manslaughter:

" The killing of a human being, without a design to effect death, by the act, procurement, or culpable negligence of any other, while such other is engaged, 1. In the perpetration of any crime or misdemeanor, not amounting to felony; or, 2. In an attempt to perpetrate any such crime or misdemeanor, in cases where such killing would be murder at the common law, shall be deemed manslaughter in the first degree. Every person deliberately assisting another in the commission of self-murder, shall be deemed guilty of manslaughter in the first degree. The willful killing of an unborn, quick child,

or any injury to the mother of such child, which would be murder if it resulted in the death of such mother, shall be deemed manslaughter in the first degree."

Manslaughter in the second degree is as follows:

" The killing of a human being, without a design to effect death, in the heat of passion, but in a cruel and unusual manner, unless it be committed under such circumstances as to constitute excusable or justifiable homicide, shall be deemed manslaughter in the second degree. Every person who shall unnecessarily kill another, either, 1. While resisting an attempt by such other person to commit any felony, or to do any other unlawful act; or, 2. After such attempt shall have failed."

Then the third degree:

" The killing of another, in the heat of passion, without a design to effect death, by dangerous weapon, in any case except such wherein the killing of another is herein declared to be justifiable or excusable, shall be deemed manslaughter in the third degree."

The distinction between the second and third degrees consisting in this: That in the second degree it is a killing in a cruel and unusual manner, whereas in the third degree it is a killing by a dangerous weapon. Then follow sundry definitions of manslaughter in the third degree, which it is not important to refer to. The fourth degree is:

" The involuntary killing of another by any weapon, or by means neither cruel nor unusual, in the heat of passion, in any cases other than such as are herein declared to be excusable homicide, shall be deemed manslaughter in the fourth degree."

" Every other killing of a human being, by the act, procurement or culpable negligence of another, where such killing is not justifiable or excusable, or is not declared in this chapter murder, or in this title manslaughter of some other degree, shall be deemed manslaughter in the fourth degree."

I have thus gone through these various definitions because

the court of appeals, in a recent case, have said it was important it should be done, and also that you may more clearly appreciate the crime of murder. Murder in the first degree consists in this:

### Murder in the First Degree.

"When perpetrated from a premeditated design to effect the death of the person killed, or of any human being, unless it be manslaughter or excusable or justifiable homicide."

Now the statute says: "From a *premeditated design* to effect the death of the person killed;" that is to say that the person *intends* to do the act which he does. That intent may have been formed immediately previous to the act, or it may have been formed a long time prior to its consummation. The lapse of time intervening between the resolve and the execution of the resolve is in no wise important. It is murder if the person *intends* the act; if he *designs* to do what he does; if he *premeditates* the killing of the person whom he slays.

### Murder in the Second Degree.

The crime of murder in the second degree is perhaps a little less marked. "Such killing, unless it be murder in the first degree" (reading as before). When this statute was first passed it was supposed by many members of the legal profession and by many members of the community, that it was designed to mark a crime of murder wherein the premeditation was not so clear and distinct as that of murder in the first degree. As for example, two men meet suddenly and through words passing between them, without any other provocation, the one, suddenly fired by wrath, kills, having formed the determination to kill upon the instant and upon the spot. Now here is a case of designed killing, but it is a killing in the heat of passion, without a sufficient provocation to bring the crime down to manslaughter in the second or third degree. That was murder at the common law and it was this class of cases to which many persons supposed this

statute applied; whereas, it was supposed that murder in the first degree was designed to mark that class of cases where the evidence of premeditation was clear and well defined, as for example a person administers poison to another; there you have the purchase of poison, the mixing of the dose, and its administration. Or where a person stealthily lay in wait for another and slew him upon meeting. You will see for yourselves that the latter cases are more marked by deliberation than the first cases I put. This, I say, was largely the opinion of the profession and the community when this section was passed. They also supposed it referred to another case, and that was where the killing was without any design to effect death when the person was engaged in the commission of a felony of a lower grade than that of arson in the first degree. As if, for example, some persons should undertake to commit a burglary in your house, and while in the act of committing the burglary, without any intent to kill, that person should slay you. This was deemed to be covered by this second section. And I should charge you, gentlemen, that this was the law were it not for a decision of the court of appeals of this state which has construed that statute and to which decision I now desire to call your attention. It is the case of *Fitzgerald* agt. *The People* (37 *N. Y.*, 413). I read from chief justice HUNT's opinion (*p.* 19) where he says:

"The killing of a human being shall be murder in the first degree, 1. When perpetrated from a premeditated design to effect the death of the person killed or of any human being; 2. When perpetrated by an act imminently dangerous, etc.; 3. When perpetrated in committing the crime of arson in the first degree. Such killing, unless it be murder, or manslaughter, or justifiable homicide, as hereinafter provided, shall be murder in the second degree, when perpetrated without a design to effect death, by a person engaged in the commission of any felony."

So that the court in their definition of this crime have excluded the notion or theory to which I have referred, that

this statute covered a case less marked in design than that covered by the definition of murder in the first degree. And then the judge further says: "This was the evident intent of the framers of the statute, and in my judgment is a justifiable construction of the language. Or, again, it may be read thus:

"Such killing, when perpetrated without any design to effect death, by a person engaged in the commission of any felony, shall be murder in the second degree, unless it be murder in the first degree (as above defined) or manslaughter or justifiable or excusable homicide, as hereinafter provided."

So that, as I understand this statute of murder as it existed at the time of the commission of the offense (of course, I do not refer to it as it now is under the law passed since the commission of this act), in every case of premeditated killing, where one kills another by premeditated design, that is murder in the first degree, and cannot come under the statute defining it in the second degree.

## Facts of the Killing.

The first question, gentlemen, that you have to settle (if it requires any settling at all) is: Did the prisoner, Joseph Waltz, kill Herman Holcher with premeditated design? The facts are in brief these: On the 21st day of April, 1873, the deceased, a resident of Albany, and a scissors grinder by occupation, left home upon a trip. It was a trip such as he was accustomed periodically to make in different sections of the country, to follow his occupation. He fixed the date when he would return, which was somewhere about the beginning of May. Not having returned by the time appointed, and the family having become somewhat uneasy from his continued and protracted absence, his widow and her son-in-law (Mr. Kelch) leave Albany in search of Holcher. They went to Hudson, Rondout, Poughkeepsie and Catskill, and thence to the residence of the father of the prisoner, at whose house the prisoner also resided. They there had an interview with

the prisoner and his father.  I need not now go over in detail
that interview.  I shall have occasion to speak of it by and
by on another branch of the case.  They returned from that
interview to Albany.  The next day they returned from
Albany to Catskill; having procured a warrant for the priso-
ner and also a search warrant, they proceed, in company with
officer Ernst and under-sheriff Bennett, to the residence of
the prisoner and his father.  When they reach this dwelling
an examination of the premises showed that in a room in the
building that was pointed out as the room where Holcher
slept, there was blood upon the floor, which had been par-
tially erased by scraping, partially by planing and partially
covered over by paint, and that blood led from this spot
across the room and the kitchen to the outer door.  They
also found blood upon the partition separating this room, as
I understand it, from the room in which the prisoner slept;
in the wood-house they found the lounge, which had the
appearance of having been recently washed, and on opening
the lounge they found a quantity of blood partially hidden
and partially covered over by ink or some black substance.
Pursuing their investigation over the premises, they found a
spot upon a road leading to the back part of the farm
where the machine of the scissors grinder evidently had
been burned.  They found the ashes, hinges, screws and some
other parts of the machine.  They also found at a place near
where the wall was lower than at other places, a number of
bloody stones.  Having made these discoveries they arrest the
prisoner.  After a denial of his guilt and after an incarcera-
tion for a time in the jail, he tells them that if they will take
him back to the old farm again, that he will point out to them
the place where the body of Holcher lay; they took him to
the farm; he goes about the premises and having viewed them
he proceeds to the house; he directs one man to go out and
another man to stay in, and in the midst of the company
which he had selected, he asks them to tell him of what he
has been accused.  They say he has been accused of this

People agt. Waltz.

murder and of robbing school-houses, and after hearing the accusations he proceeds to make a confession, which confession admits the killing, the burial and secretion of the body, and ends by conducting the people to the spot where the deceased was interred, and an excavation showed the scene in all its horrid details. There can then be no doubt but that the prisoner did this deed. Indeed his counsel in opening and in closing have frankly conceded that he did the act. So that in regard to the commission of the homicide there is no dispute. Herman Holcher came to a violent and untimely death at the hands of the prisoner, and may I not further say that if the prisoner was capable of reasoning, if he was capable of reflection and of understanding the act, that the killing was with the design which the statute marking the crime of murder in the first degree emphasizes? But it is said in the prisoner's behalf, and this is an important and solemn question you are to decide, though he did do this act he is not responsible for its commission; that he is insane; that though the hand wielded the hatchet that struck those terrible and killing blows, the soul, the intellect, the mind of the man, did not, by reason of impaired intellect, do the act and impel the hand. If this be so it is a defense. The statute has declared that no insane person can be punished for a criminal act; he is not in the eye of the law responsible, neither before this tribunal nor before the Greater and Higher Tribunal to which we must in the end render our account.

### What is Insanity ?

But what is insanity ? What must be the mental condition of the party who is to be excused on account of that mental condition ? How much intellect, understanding, judgment and comprehension must he have to make him amenable to the law ? This, gentlemen, is a question for the court, and as the court lays down that law to you, you will be guided and governed by it in your deliberations. Questions of fact belong to you; questions of law to the court. Trench not

upon the prerogative of the court and the court will be care-
ful to leave to you that which the law makes it your duty to
decide.   What, then, I repeat, must be the mental condition
of the person who has done the act, otherwise unlawful,
which will excuse him for the commission of such act?

The term " insanity " is a somewhat vague one.   There are
different degrees of mental power in a healthy person.
There are various degrees of capacity among persons whose
intellect may be slightly impaired.   In regard to the civil
affairs of life, that act is a good and lawful one which is done
by a person who understands the act.   The law can make no
difference between the talented and those who are not, in
regard to the execution of a deed or a will, so long as the
person of the lesser intellect has enough capacity to under-
stand and comprehend the act which he does.   And so in
regard to crime.   The person who comprehends crime in *all*
its monstrosity is liable.   The person whose intellect is less
than that, so long as he has sufficient comprehension to
know that the act is wrong and is forbidden, and will be pun-
ished by the law, is equally responsible; no more so and
none less so.   The law, gentlemen, does not recognize insanity
as a defense so long as the person understands and compre-
hends the act.   That the person pretends he is impelled by
an irresistible and overwhelming impulse to commit the act,
will not make a defense.   It will not do for a person to say,
" I was tempted to crime and was overcome by temptation."
If he knows the act is wrong and is forbidden he must resist
the temptation; and if he commits the act he does it at his
peril.   Neither will it do to excuse the commission of crime
because a person believes in spirits.   Belief in spirits may be
evidence for a jury to found its judgment upon in regard to
the understanding and comprehension by the party accused
of the act and crime.   But belief of spirits in itself— that
the party sees or hears spirits — that spirits whisper to him
and bid him do this act — that of itself is no defense, pro-
vided the judgment and reason which God gave to him and

spared to him, declare to his consciousness that the act was wrong, and that the laws of God and man forbid it.

This, gentlemen, is no new doctrine; it is as old as the country from which we have borrowed the most of our learning and our law. I refer now to the law of England. And that you may see what the law of that country is upon that question, let me call your attention to some extracts from that law which I have carefully culled:

" To justify the acquittal of a person indicted for murder, on the ground of insanity, the jury must be satisfied that he was incapable of judging between right and wrong, and that, at the time of committing the act, he did not consider that it was an offense against the laws of God and nature."

This opinion was given by lord LYNDHURST in the case of *The King* agt. *Offord*. Another judge thus says:

" Where, upon a trial for murder, the plea of insanity is set up, the question for the jury is : ' Did the prisoner do the act under a delusion, believing it to be other than it was ? ' If he knew what he was doing and that it was likely to cause death, and was contrary to the laws of God and man, and that the law directed that persons who did such acts should be punished, he is guilty of murder."

This was the opinion of MARTIN, J., in the case of *The Queen* agt. *Townley*. And again:

" The circumstance of a person having acted under an irresistible influence to the commission of homicide is no defense, if, at the time he committed the act, he knew he was doing what was wrong."

That is the opinion of BRAMWELL in *Queen* agt. *Haynel*. The same doctrine has been enunciated in various states of this Union.

" In a trial for murder, a charge ' that the true test of insanity is, whether the accused, at the time of the commission of the crime, was conscious that he was doing what he ought not to do,' is proper."

That was held in the case of *The People* agt. *Hebson* (17 *California*).

" The test ·of such insanity in criminal cases, as will excuse the commission ·of a crime, is whether the .accused, at the commission thereof, was conscious that he was doing what he ought not to do."

*The State* agt. *Spencer* (1 *N. J.*, 196).

" It is not every kind or degree of insanity which exempts from punishment. If the accused understood the nature of the act, if he knew it was wrong and it deserved punishment, he is responsible."

This is the case of *The U. S.* agt. *McGlenn* (1 *Curtis Ct. Ct. Reps.*).

" If a man has capacity and reason sufficient to enable him to distinguish between right and wrong as to a *particular act*, for the ·commission of which he is on trial, if he has knowledge and consciousness that *the* act he is doing is wrong and will deserve punishment, he is, in the eye of the law, of sound mind and memory, and therefore criminally responsible for the act."

And, gentlemen, the same doctrine has been enunciated in a recent case in the court of appeals of this state, which is our highest court, and whose decisions must be our guide in the determination of this one. The case is reported in 52 *N. Y.* (*Flanagan* agt. *The People*). The prisoner was convicted in the general sessions of New York city of the crime of murder in the second degree, he having been indicted for murder in the first degree, for killing his wife. The counsel for the prisoner made these points:

" No man can commit a crime, although he has *understanding*, if he has no *will*. The right and wrong test as to the contemplated act is not favored. The power of *choosing* right from wrong, is as essential to legal responsibility as the mere capacity of *distinguishing* right from wrong."

That is to say, the prisoner's counsel said he must have the power to *choose ;* that is, to determine what he would or

would not do; whether he should do the act, or whether he should not do it, and this was just as important in determining whether he was insane or not as his power to *distinguish* between the right and the wrong of the act. In other words, the counsel for the prisoner claimed that though the prisoner might have reason enough to tell him that the act was wrong — that the laws of the land and God forbid it — yet, if he had no will to resist the influence which bade him do the act, then he was crazy and insane, and not criminally responsible. It presents to a certain extent one of the very propositions which the counsel for the prisoner has raised here. It presents almost the identical question which is raised by the confession of the prisoner in the case. Now what did the court of appeals say? They refer, in the first place, to the case of *Willis* agt. *The People.* That was a case in which I was concerned, and where the rule in this state was pretty thoroughly settled. The court, through ANDREWS, J., says:

"That the test of responsibility for criminal acts, where unsoundness of mind is interposed as a defense, is the capacity of the defendant to distinguish between right and wrong at the time of, and with respect to the act, which is the subject of the inquiry."

Of course, he must be able intelligently to distinguish between the right and the wrong; he must have a comprehension and knowledge that the act is forbidden; it must be present to his mind at the time he resolves to do it. But if that intelligence and comprehension be present — if there is a voice within him saying, "Do not this act," and he understands that if he does it it is wrong, and the law will punish him, then, if he does it, he is responsible, even though he may claim that some mysterious influence or spirit urges him on and destroys his power to resist. I further read:

"We are asked in this case to introduce a new element into the rule of criminal responsibility, in cases of alleged insanity, and to hold that the power of choosing right from wrong is

as essential to legal responsibility as the capacity of distinguishing between them, and that the absence of the former is consistent with the presence of the latter.

" The argument proceeds upon the theory that there is a form of insanity in which the faculties are so disordered and deranged that a man, though he perceives the moral quality of his acts, is unable to control them, and is urged by some mysterious pressure to the commission of acts, the consequences of which he anticipates but cannot avoid.

" Whatever medical or scientific authority there may be for this view, it has not been accepted by courts of law.

" The vagueness and uncertainty of the inquiry which would be opened, and the manifest danger of introducing the limitation claimed into the rule of responsibility, in cases of crime, may well cause courts to pause before assenting to it.

" Indulgence in evil passions weakens the restraining power of the will and conscience; and the rule suggested would be the cover for the commission of crime and its justification. The doctrine that a criminal act may be excused upon the notion of an irresistible impulse to commit it, where the offender has the ability to discover his legal and moral duty in respect to it, has no place in the law. ROLFE, B., in *Rogers* agt. *Allunt*, where, on the trial of an indictment for poisoning, the defendant was alleged to have acted under some moral influence which he could not resist, said : ' Every crime was committed under an influence of *such a description*, and the object of the law was to compel people to control these influences.' "

That, gentlemen, is the law of this case. It is the law which must govern you in your deliberations. You are not to ask yourselves the vague question whether the prisoner was or was not insane, without having any clear or definite comprehension of what insanity is; but you are to ask yourselves the question: Did the prisoner understand this act when he raised that hatchet and smote Holcher those fatal blows? Did he understand that the laws of God and man

forbade him; and did he know that those laws would hold him responsible for it when discovered and brought before a tribunal of justice? If he *did*, he is guilty. No matter though he says, and his counsel for him argue, that an irresistible, mysterious power urged him on to the commission. This is no defense. The law says it is the duty of the person to resist these influences, and to successfully resist them. The safety of society, the protection of life, require that we should hold persons accountable for crime who know that the act which they do is a criminal one.

Whilst I have been thus careful to charge you upon the law as to what degree of knowledge or understanding a person must have to exempt him from punishment, I have not designed, nor do I design any where in the progress of this case, to intimate to you any opinion or judgment upon the question of fact, as to whether or not the prisoner had this comprehension. That is a question for you, and it is the next question to which I proceed to call your attention. For the purpose of aiding you in your deliberations in reaching a just conclusion upon this question, I propose to refer you, very briefly, to some of the salient points of the evidence upon both sides, and then I leave the question for you to decide upon your oaths and judgments.

### *Prominent facts proved on the part of the prisoner.*

Let us glance, in the first place, at some of the prominent facts proven on the part of the prisoner. It is said that some three or four years ago that the life and habits of this young man changed. They say that up to that time he had been a man of most exemplary conduct and deportment, remarkably so for one in his position in life, when suddenly he changes his characteristics, and that his reason no longer controls his actions and governs his conduct; and to prove this proposition they have adduced quite a mass of evidence. First and prominent, of course, is the evidence given by his father and sister, who had a better opportunity of knowing what this

young man had been previous to the commission of this act, and who have a better knowledge of his nature. They say that some years ago his conduct did change; he became at sometime sulky, sullen and morose; at times he would answer no questions; at times would refuse food; he commenced about that time, they say, to build a tower, from the top of which he was to speak his speeches to the world, and in which he was to study and write. They say, also, that about that time he had three epileptic fits, thus showing that the physical system had in some way become impaired, and, as a natural consequence, the mental powers had become enfeebled and weakened. They speak of an occasion when, at night, he went out among the vines shooting, claiming that he saw some persons among the vines, whilst both the father and sister say that though they carefully searched through the vines they could see or hear no one, and they left him shooting; and he continued to do that for the space of about three hours, he having shot for about an half hour before they went out. I have not undertaken to enumerate all that they have said; though I may mention one other fact. They say his mind became so impaired and confused that he could no longer make change accurately, and the sister was sent with him. That in driving he became abstracted and moody, that the lines hung down in the wagon, and that he paid no attention to the horses' direction. Of course this is the evidence of the family of the accused. You are not to disbelieve this because they are the witnesses who testify to it, but you certainly are to look at this evidence with some care, from the very position which they occupy toward the accused. It is a terrible strain for human nature, gentlemen. God grant that neither you nor I may ever be subjected to a similar ordeal. The father says (and you are to take into account how far you are to rely upon him), that he discovered no blood upon that floor, and heard no noise that night. There is evidence in the case (I don't know whether they speak truly or not — it is a question for you), that he did

say, when seen by Mrs. Holcher and Kelch, that he did hear a noise that night, that he was about striking a light and going down stairs, but the noise ceasing he returned to bed. Mrs Holcher swears that in going to the room and pointing out the bloody stain upon the floor of the room where her husband slept she said: "This is the blood of Mr. Holcher." It is also proven that he said to some of the persons there that he (Holcher) had the nose bleed that night. However, he denies all this. I do not say that because of these things you should disregard his evidence; far from it. I merely mention these facts as facts for you to consider in judging of the reliability to be placed upon the evidence, detailing the conduct of the accused prior to the commission of this offense. It is a question for you. You have a right to believe it fully. You have a right to say that every word that old Mr. Waltz and his daughter uttered is not shaken in the least. You must do so carefully and with deliberation, and that you may do it with deliberation I have made to you these suggestions in regard to Waltz's evidence.

They have also called Mr. Jacob Goetchius and wife, who speak of the change. Mr. Goetchius says, at times he would see Waltz going around over the premises casting his eyes upward and gesturing — a thing that he had not observed until recently. At times and passing him upon the road he would not speak, though always accustomed to speak prior to the time. And the wife speaks of an occasion when she was sweeping in the yard and saw Waltz going by with his head down and countenance very sad and dejected. These are facts for you to pass upon. You are to weigh them and give them all the weight which you can reasonably for the benefit of the prisoner, because the law presumes innocence and not guilt. It throws around the person of every one this shield of protection, and you are to give to this unfortunate accused the benefit of that rule. They have also called James Reid, James Reid, Jr., and Eliza Taylor, who say that on the 9th of May, 1873, a man came to their place, asking for something

to eat; that he came up to the house singing and shouting, and having procured some bread and milk he went away, soon being followed by Mr. Reid and his nephew, and was found a short distance away, seated against a tree, with his feet extended against the ground, looking up the hill; that this man professed to be a disciple of the sun, moon and stars; he spoke of the sun as the great father of light, and made a prayer to it; and his language and gestures were very excited, and his manner evidently that of a person bereft of reason. They say that this person whom they saw on that occasion was the prisoner. Gentlemen, this is highly and most important evidence — it certainly shows a great degree of insanity. The important question for you will be, was this the prisoner of whom these witnesses have spoken. No one will suspect, for a moment, that these respectable people came here to give any thing but their honest impressions. I have no doubt, in my own mind, that Mr. Reid and his sister-in-law and nephew all think, and think honestly, they saw the prisoner, and they may be right. It is a question I leave to you. But it is a question which you must carefully examine, for upon your examination of this question very much depends.

The next class of evidence to which the counsel has referred is the letters, and they certainly are somewhat remarkable. The first letter is the letter left in the Leeds school-house, where, after informing the pedagogue, &c., of the commission of the offense, he proceeds to say that the robbery has been committed by a band of outlaws from British Columbia, and that they are going to proceed westward to the Cairo school-house and steal books, which will be of great service to the half-civilized Indians of British Columbia. He says they are under the influence of Belial, meaning, I suppose by that, the devil, and that while they know it will be better to be under the influence of man rather then the devil, yet they are under his influence, and unable to resist, and therefore they pray they may be forgiven. You have heard the comments of the

counsel for the people upon this letter, and also the views given you by the counsel for the prisoner. You are to decide which is the right and which is the wrong. As I said to you a moment ago, it is not enough for a person to fancy he is under the influence of the devil or that the devil tempts him, if he knows the act is wrong, but it may be evidence that the mind is diseased, deranged, disordered and disorganized so that he is unable to comprehend and understand the act. I submit this to you.

Then there is the letter upon the telegraph pole near Coxsackie, posted there, and portions of the machine thrown around; in which letter he says sundry other strange things. That the band has been joined by a new man who proposes to rob banks, &c., not in the ordinary way, but to enter them in broad daylight by superhuman skill. Then the poetry has been read to you. All this you are to consider as bearing upon his mental condition at the time he did the act, for I may as well say here, lest I forget it, that you are not to say whether the prisoner is now insane, but you are to say whether he was or was not insane at the time he struck those blows; whether he understood the nature and character of the act he did. If he is insane now, the law provides for a mode of ascertaining it, and he cannot be executed or punished so long as he is insane. That thing will be carefully seen to hereafter. The question for you, then, is: What was his mental condition at the time when Holcher came to his death at his hands?

So again the prisoner's counsel say there was no motive for the commission of this crime. He had borne previously a good character, and you must look at the case of the people in precisely the same light that you would if either one of the counsel, or yourselves, or the court, were upon trial for this act. The law makes no distinction between persons. It does not discriminate between the parties. Good character tells for counsel and it tells for the humblest individual in the land. It should weigh always in every case. But, gentlemen, no

character, no matter how unsoiled, no matter how unstained, can exempt a person when the evidence shows him to be guilty. But give to the prisoner the benefits of it. On behalf of the prisoner, Dr. Molvaut (a French doctor), and Dr. Philip, testify they think he is now not in his right mind. Dr. M. saying it is melancholia and monomania, and Dr. P. not particularizing, as I understand him, the kind of insanity, but he expects it will end in idiocy by and by. Dr. P. also gives you the reason why he thinks him insane; among other reasons is his conduct upon the occasion when he made his confession; his continually asking the question, "Is that all?" speaking of what crimes he was accused. That is to his mind very high evidence of his being not very sound. Having given you the reason you must judge of the soundness of it yourselves.

### *People's evidence.*

This is the evidence for you to consider on the part of the prisoner. Now what have the people proven? They say that this man's habits have not changed substantially and really. They say that up to the time of the commission of this offense he was, substantially, the same Joseph Waltz that he always was; that therefore the argument to be derived from the change in his habits and manner is not correct and sound, and they have given you a number of witnesses on that point. Here are James Goetchius and wife, who dealt with him in buying potatoes, very near to the time of the homicide. Mrs. Shearman, who appeared so intelligently on the stand; she spoke of having bought hay of Joseph, some time prior to the homicide; on Monday after May first, she bought potatoes; and the day before the arrest, at night, and therefore upon the evening of the very day when the prisoner had had this searching and terrible interview with Mr. Kelch and Mrs. Holcher, that he came to her house and asked her for the money. You remember her conversation about making change and about the five dollars, whether she

should give him three dollars and hand him the remaining one dollar in the morning, or whether he should change the five dollar bill and return the one dollar to her. She says she saw no change; and she gave you the conversation occurring at that time, and you must judge of that for yourselves.

Judge Osborn : She spoke of the peculiarity of the eye.

The Court : I had forgotten that. She says she did notice a peculiarity in his eye; though she didn't notice any peculiarity in his conversation. As I said, it was the night of the day during which he met Mr. Kelch and Mrs. Holcher. Then N. P. Cowles, John T. Mann, Thomas Bell, and Depew C. Wildey are called for the purpose of proving that they noticed no change in his manner and conduct. Mr. Wildey, you will remember, was the dealer in fruit trees, and who speaks of him as quite a sharp man in his deal; he had dealings with him the fall previous; he came after his money, and Joseph said as he met him, " I know what you are after, I have the money ready for you," and proceeded to the house and got fifteen dollars due. Wildey speaks of him as being a nervous man, but very emphatic, quick, and decided.. I may also allude to the fact that Joseph told him at that time about taking up certain vines, because they had been winter-killed and found to be unprofitable. Whether these are the same vines alluded to by the prisoner I know not. You will remember the circumstances proved on the part of the prisoner that he destroyed a number of valuable vines. You will regard the evidence of Mr. Wildey in connection with that fact.

The prosecution also claim that James Reid and others are mistaken in supposing that the person who came about the ninth of May is the prisoner. They have proven these facts, and I just group them to you and leave you to decide the question. They say they have shown there was a man who answered the description of the one described by the Messrs. Reid, around the country about that time; that that person

was not the prisoner. John Wolf, a carpenter, saw that man on or about the fourth of May, near Jefferson; he was barefooted and claimed to be a disciple of the sun, moon and stars. And other persons speak of seeing a man who was barefooted, and one person saw him with his shoes on, being evidently deranged and going about the country. Then the next step is, they say they were mistaken as to the time. They say that on May second and ninth it rained. They have produced before you the diaries of old Mr. Wilcox and his daughter, showing that on the second and ninth of May it was raining; whereas the evening when Mr. Reid saw him was a bright moonlight night, remarkably pleasant, and dusty. You observe that the next week (the sixteenth) would be the very day of the arrest, and at that time he was in jail, and could not have been the man. Prisoner's counsel claim it was on some evening previous to that, and that Mr. Reid is mistaken only in time. That is a question for you.

Then there is another class of evidence. They prove by John and Sarah Raeder that they heard a man on their stoop one very pleasant night, and they heard of the meeting between Reid and this person the next morning; and that this occurred *after the arrest* of Waltz; and therefore it is argued that it could not have been the prisoner. You remember Mrs. Raeder speaks of her having gone to visit, and her return, and she is precise and particular in saying that she knows the date and the circumstance. Then, there is also this piece of evidence, that Reid, after his visit to Waltz last December, told Rheinhardt that the person who was in the jail was not the party he saw. That is a question which you are to decide. And, lastly, it is argued that this man could not have been the prisoner, because his manner and deportment point him out to be some other person than the prisoner, and it is argued that no person who ever saw Mr. Waltz in one of his fits of alleged insanity, saw the kind of conduct which the Messrs. Reid and Mrs. Taylor say this man exhibited. Mr.

Waltz, when manifesting alleged signs of derangement, was morose, sullen, ugly, destructive and furious, refusing to recognize his intimate friends; sometimes refusing to speak to his father and mother. But this person who was at the house of Reid that night, and with whom R. conversed under that tree, was a good-natured, talkative and communicative man; he was the disciple of the sun, moon and stars, and made a prayer in their presence to the sun as the great father of all light; and it is argued, that the difference between the manner and habits of the man who was upon the stoop of Raeder upon that night, and the prisoner, is so marked and striking, as of itself to show that it could not have been the prisoner. Mr. Reid, his nephew and sister-in-law are positive. It is for you to say, and not for the court. There is one other fact to which I should perhaps call your attention, and that is, that Mrs. Taylor speaks of the person whom she saw that night, as a person with a slight Irish accent. Mr. Wolf says that the person he saw on the fourth of May, had a slight Irish accent, and was not the prisoner. Mrs. Taylor says that the person who came there had no German accent. That is all the evidence bearing upon that question. You are to decide whether Mr. Reid and his nephew are mistaken or not.

Judge Osborn: Mrs. Taylor also says that, from some of the prayers, she supposed the prayer was in Dutch or German.

The Court: If that be so, the jury will remember; I do not now recollect the fact. The voice she said was a peculiarly sweet one; more like a female voice than a male one. Mr. Reid has heard the prisoner speak, and recognizes the voice as the voice he heard that night.

The prosecution say that the letters introduced prove nothing, and that they show a belief in spirits, and the belief in spirits will not excuse. I have already charged you upon this, and it is not necessary to repeat it. If a person who believes in spirits is to be excused for the commission of crime, where would this strike? How many doctors are there who profess to practice medicine, guided by the advice

of spirits? Many who perfectly understand what crime and its consequence are. Aye, how many lawyers practice at the bar, who daily profess to be advised by spirits, in regard to difficult and intricate questions? Probably some of you may remember the famous case in New York of Mumler, who was arrested for obtaining money under false pretenses; the alleged false pretense being that he professed to take spiritual photographs, when it was not true. A very learned and eminent man, whose name delicacy forbids me to mention, testified upon that trial to his belief in the existence of spirits, and that he was accustomed to hold intercourse with the spirits of dead friends. And yet that person is one whose name, if I should mention it, would be recognized among the soundest and foremost men in the state. I do not say that the belief in spirits is no evidence of insanity. · I wish that understood; it may be evidence. What I mean to say is, that a person may believe in spirits and profess to hear their whisperings and to listen to their promptings, and yet be able to discriminate between right and wrong. It is evidence for you to consider.

The prosecution further say that if these letters which have been introduced show that this man was slightly demented, others show that he was perfectly sane and rational, and they refer to two of the letters — one written to New York about the boxes, and the other to the commission merchant who was accustomed to sell fruit, and they bring before you a memorandum book kept by the prisoner, showing entries up to and on the day of the homicide, and immediately subsequent showing an accurate perception of what had occurred, and charging himself with things that he had sold. Now I know a crazy person may sometimes do sensible things. A crazy person sometimes has power and acuteness upon some subjects which the sane cannot equal. But, nevertheless, that at that time and upon that occasion he was able to make these memoranda, showing perfect comprehension of his act, *is* evidence for the jury to consider, and you should weigh it

in determining whether he had mental power enough to discriminate between the right and wrong in this particular case.

They have called upon several physicians — Drs. Fanning, Jewell, Mackey and Wetmore, men of character, intelligence and learning in their profession, who have made this case a study. It is true they cannot be so expert as physicians who have made insanity a specialty. It is true they cannot have the entire acquaintance with this disease which a life-long pursuit of it will alone give, but still having made it their study for some period of time, and having entered upon the examination of this man, as we may suppose, with conscientious motives and conscientious resolves, their evidence is somewhat important for you to consider. Dr. Fanning says he is not prepared to say that this man is insane.

That is as far as he goes, but Drs. Jewell, Mackey and Wetmore go further, and say that these exhibitions which you have witnessed in the court room are feigned, and not real. This, gentlemen, is highly important evidence. While the law throws around the insane the protection that no person is responsible for crime unless he comprehends the act, yet a cunning criminal should not, by feigned insanity, protect himself from the consequence of the act. I do not say these physicians are right. I am unable to decide. I leave this evidence with you. You are to give it such weight as you deem important.

I have thus, gentlemen, gone through the evidence outside the commission of the offense, pointing either for or against this defense. There is another branch of this case to which I direct your attention. Prosecution say that you must look at the circumstances of the homicide, its surroundings ; the conduct of the prisoner in the commission, secretion and confession of the crime, as bearing largely upon the point whether he did or did not understand the act. They say that he killed Holcher and robbed him. They ask the question : Unless this man understood the act, why, having did

it, did he conceal and bury that body? And they ask the question: If this man was doing what he supposed he had a right to do, why conceal that which was the highest evidence that he was a criminal in the eyes of the law? Not only bury that body, but carefully bury it; plowing over the spot where it reposed; plowing it so carefully and skillfully that the crowd who searched that Sunday could not perceive the burial spot. And they ask the question: If he was unconscious of the awful act which he had committed why did he do this? The floor where the blood had flown had been scraped; over this there was oil, and over this still paint, and the plane had also been used upon it; the machine of Holcher was burned and broken; and when he was pointed to the blood upon the floor he said: "Holcher's nose bled in the night;" when pointed to the paint he said that Holcher was sick in the night, having gone to bed somewhat drunk, and had vomited, and getting up had upset the paint over the floor;" and when arrested by Ernst, who said, "We will arrest you for this crime," Waltz fastened his eye upon the officer who made the accusation and said: "You don't believe that; all our neighbors know we are honest and would do no such thing." Again, when coming to the village of Catskill, he said, in regard to the accusation: "This makes me feel rather queer; but I know I am innocent and will come out all right in the end." Then you have the conversation with Meech on Sunday; Meech rehearses to the prisoner all the circumstances which they had discovered; telling him they had discovered the blood upon the floor; the blood in the house leading out of doors; the blood upon the lounge; the bloody stones; the machine burned; the letter upon the telegraph pole; and then, grouping together these things, he urges him to make a confession so his father and mother should be exonerated if they were not guilty; or if there were any extenuating facts that he may have the benefit of them. He takes time until the following morning to think it over. He tells Mr. Meech to come the next day, and

when Mr. M. comes he avows his intent to make a clean breast if taken to the spot. He goes all around the premises. He asks the persons in the room who were present when he makes the confession: " Of what am I accused ?" They say " of burning and robbing school houses, and this homicide." He asks, " Is this all ?" and then proceeds to make a confession. In that confession it is urged, by the counsel for the people, that he admits he struggled against the evil spirit which bade him do that act; that he prayed that he might have strength to' resist it. Finally, overcome and overpowered, he went out, and procured the hatchet and did the deed. And the prosecution ask, as they have a right to ask: " Did this man understand the nature and the character of the act he did ? Did he know that the law of the land forbade him ? Did he know that the higher law, springing from God, said ' Thou shalt not commit murder ?' Did he know the laws of the land would punish him for it if he did it ?" Gentlemen, this evidence bears upon that question, and you are to give it its due force and weight. I do not say that a crazy or insane person would not thus have acted. I do not say that this evidence is entirely to control your judgment and guide your verdict, for a crazy person may sometime do a cunning or sane thing. But keeping your mind on the test — Did this man understand this act and know that it was wrong ? — you are to answer, in the light of this evidence, whether he did or did not so understand.

There is one other piece of evidence to which I propose to advert, and that is, that Meech said that during that interview Joe asked him this question : " Can the penalty for this act be less than death ?" And Mr. M. said that he evaded the question, and told him that he could answer that question as well as he.

I have thus, gentlemen, gone carefully through this case. I have not pretended to give to you all the evidence for the prisoner or the people. There may be other evidence equally important which I have overlooked, and which your memory

may recall, and to which you must give force and effect when you recall it.

### Submission of the case to the jury.

In committing to you the consideration of this case I will further say, if there is a reasonable doubt that the prisoner understood the act — that he knew it was wrong and forbidden by the laws of God and man, and would deserve punishment, then the prisoner must have the benefit of that doubt, and you must acquit him. But it is not a doubt as to whether he was sometimes queer; not a doubt as to whether he believed or did not believe in spirits; not a doubt whether he was overpowered by an irresistible, mysterious influence; but a doubt springing from the evidence upon the question whether he understood the act which he did, and that that act was forbidden and wrong. I give the prisoner the full force of that rule, in consequence of the case of *The People* agt. *McCann, in* 16 *New York.* Up to that time, as I understand the law to have been in this state, upon the prisoner devolved the burden of proving that he was insane; that the law presumed a person who committed crime to be sane, insanity being a matter of defense to be proven, and proven beyond all doubt. But this case shifts this responsibility and throws it upon the people. The people must satisfy you beyond all reasonable doubt that the prisoner understood this act; that he had reason, perception and understanding sufficient to know that the laws of God and the land said he should not do it. But if, having reason and understanding sufficient to understand the act, and to know it was forbidden, he still went on and did it, professing to act under a mysterious pressure, or moral insanity, or call it what you please — the pressure of a devil or a spirit — cannot alter or change the character of the act which he did.

Let me further say, in disposing of this case, that you are to meet your responsibility as men. In giving to the prisoner the benefit of a doubt, it must not be a chimerical

or fancied doubt. That is not the way. You are to judge. You are to exercise the reason God has given you. You are to reflect upon the evidence and ask yourselves : "Is there reasonable doubt that the prisoner committed the homicide with deliberate design knowing what he did? That the law would punish him for the act if discovered?" If thus reflecting you can say you have a reasonable doubt, acquit the prisoner. If, on the other hand, you have no doubt, then convict him. The duty is painful but clear. Your oaths require it. The protection of society demands. Of course, popular clamor has no influence here. It should not enter into the judgment of the jury or sway the conscience of the court. .The verdict which you render, and the opinions which the court has given this day must meet us before a Higher Tribunal, where there can be no errors of judgment, and where the decision will be just, right and final. That Tribunal will not hold you guilty for a mistaken, honest error of judgment, but it will hold you guilty if your verdict is founded upon passion or feeling on the one hand, or false and mistaken sympathy on the other. Take, then, this case, and may God give you the judgment and the integrity to decide it aright.

Judge Osborn then submitted the following requests to charge:

1. If the jury believe prisoner was insane when he killed Holcher they should acquit him. (Charged.)

2. That if insanity exists, it will excuse from criminal punishment an act committed under its influence, whether the insanity exhibit itself as to one or a large number of subjects. (Charged.)

3. That the ability or power to distinguish between right and wrong at the time of, and in reference to the particular act in question, viz., the killing of Holcher, should be of such a character as that the accused could choose the right and avoid the wrong, and intelligently understand the

consequences that should follow from adopting the one or the other course. (Charged, except so far as it enunciates the doctrine of a weakness or want of will to resist temptation.)

4. If Waltz was in such a condition mentally, at the time of the killing, that he had not the power or ability to resist doing the act, he must be acquitted. (Not charged.)

5. If the jury believe that the mental condition of Waltz at the time of the killing was such as to pervert the will, intellect and moral nature of the defendant so that he could distinguish between right and wrong as a reasonable and intelligent being, and had not the reason and intellect to resist the act he should be acquitted.

The Court: I charge that he must have had reason sufficient to comprehend and understand the act, and know that the act was wrong and forbidden.

Exception by defendant.

6. If the jury have any reasonable doubt upon any of these propositions, they should acquit. (Charged.)

7. That the law does not require that the insanity or mental unsoundness which absolve from crime should exist for any definite period, but only that it exist at the moment that the act complained of was committed (Charged.)

8. "A prisoner must have sufficient memory, intelligence, reason and will to enable him to distinguish between right and wrong in regard to the particular act about to be done, to know and understand that it will be wrong, and that he will deserve punishment by committing it. He must have intelligence and capacity enough to have a criminal intent and purpose, and if his reason and mental powers are either so deficient that he have no will, no controlling mental power, or if, through the overwhelming voice of mental disease, his intellectual power is for the time obliterated, he is not a responsible moral agent, and is not punishable for criminal acts."

The Court: I charge all of that law except so much as claims that the prisoner is to be excused if he had not the will to

resist the crime.    So much of it as refers to the power of will I do not charge.

Defendant excepts.

Judge Osborn : I also ask the court to charge the jury, if they shall be satisfied that the prisoner had the power to distinguish between right and wrong at the time of and in regard to the particular transaction complained of, so as not wholly to escape criminal responsibility — yet if they are satisfied that he had not sufficient intellect or mind to premeditate the act within the meaning of the law defining murder in the first degree, that then and in that case they may convict of murder in the second degree.

The Court: I charge that if the prisoner had not sufficient intellect to form a premeditated design mentioned in the statute defining the crime of murder in the first degree, then they cannot convict him of that crime.

Defendant excepts.

Judge Osborn : I ask you to charge, that unless the jury are satisfied that Waltz, at the time of the commission of the act complained of, had sufficient mind and intellect to premeditate the killing within the meaning of the law, then he cannot be convicted.    (Charged.)