THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
v. HANS SCHMIDT, Appellant.

Murder — motion for new trial on ground of newly-discovered evidence — statement by defendant that his confession was false and plea of insanity feigned and that he did not commit the murder is not newly-discovered evidence within meaning of statute (Code Crim. Pro. § 465) — erroneous charge as to meaning of word "wrong" in statutory definition of "insanity" (Penal Law, § 1120).

1. A motion for a new trial in a murder case upon the ground of newly-discovered evidence must be denied where such evidence consists of an affidavit by defendant stating that his confession, proved at the trial, that he committed the murder and his defense of insanity were false; that, on the contrary, his victim was not murdered but died from a criminal operation performed upon her to which defendant and others were parties, and that he made the

confession and feigned insanity in the hope that he might be acquitted and his confederates go free. Such statement is not "newly-discovered evidence" within the meaning of the statute (Code Crim. Pro. § 465, subd. 7), and, therefore, the courts have no power to grant a new trial thereon, and it is not necessary to determine whether his present story is true.

2. Where such defendant, in support of his plea of insanity, told the physicians who examined him at the trial that he had heard the voice of God calling upon him to kill the woman as a sacrifice and atonement, it was error for the trial judge in his instructions to the jury to charge, in substance, that even if the defendant believed in good faith that God had appeared to him and commanded the sacrifice of his victim, and this belief was a delusion, the result of a defect of reason, the defendant must none the less answer to the law if he knew the nature and quality of the act, and knew that it was wrong, in the sense that it was forbidden by the law of the state. The word "wrong" in the statutory definition (Penal Law, § 1120) should not receive so narrow a construction. In the light of its history and the authorities, collated and discussed herein, defining and explaining the word, it cannot be held that the word "wrong" in the statutory definition is limited to legal as opposed to moral wrong. The defendant, however, by conceding that the issue of his sanity was correctly determined by the jury, has forfeited his right to avail himself of the error in the charge. There is nothing to show that he is mentally incompetent to conduct the appeal, to advise with counsel, or to understand the meaning and consequences of his own affidavit. If, however, the confession is only another manifestation of disease, the law provides a remedy.

3. A contention by defendant that his conviction should be set aside, under the rule that "a conviction shall not be had upon a plea of guilty where the crime charged is or may be punishable by death" (Code Crim. Pro. § 332), is untenable. The statute has no application to this case. The defendant was not convicted upon a plea of guilty. He has been tried before a duly organized court and found guilty and there was no denial of due process of law.

(Argued October 27, 1915; decided November 23, 1915.)

APPEAL from a judgment of the Supreme Court, rendered February 11, 1914, at a Trial Term for the county of New York upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

*Alphonse G. Koelble* for appellant. This court has never failed to set aside a verdict of murder in the first degree where it appeared that injustice has been done to a defendant. (*People* v. *Corey,* 157 N. Y. 332; *People* v. *Driscoll,* 107 N. Y. 414; *People* v. *Lyons,* 110 N. Y. 618; *People* v. *Filipelli,* 173 N. Y. 509; *Barrett* v. *Third Ave. R. R. Co.,* 45 N. Y. 628; *People* v. *Benham,* 30 Misc. Rep. 466; *People* v. *Lane,* 31 Hun, 13; *People* v. *Hovey,* 1 N. Y. Cr. Rep. 324; *People* v. *Shea,* 16 Misc. Rep. 119; *People* v. *Jones,* 25 Wkly. Dig. 541; *Smith* v. *Matthews,* 21 Misc. Rep. 150.) The trial court erred in failing to charge correctly the law as to insanity. (*People* v. *Walz,* 50 How. Pr. 204; *Casey* v. *People,* 31 Hun, 158; *People* v. *Casey,* 1 N. Y. Cr. Rep. 190; *Moett* v. *People,* 85 N. Y. 373; *People* v. *Krist,* 168 N. Y. 30.)

*Charles A. Perkins, District Attorney* (*Robert C. Taylor* of counsel), for respondent. The trial judge correctly stated the legal test of responsibility, and defined the word "wrong" as meaning "criminal, contrary to the laws of the state." (*People* v. *Gaimari,* 176 N. Y. 84; *Moett* v. *People,* 85 N. Y. 373; *People* v. *Katz,* 154 App. Div. 44; 209 N. Y. 311.) There is no inherent power to grant a new trial. (Code Crim. Pro. § 465, subd. 7; *Quimbo Appo* v. *People,* 20 N. Y. 531; *People* v. *Greenwall,* 115 N. Y. 520; *People ex rel. Jerome* v. *Ct. of Gen. Sess.,* 112 App. Div. 424; 185 N. Y. 504; *People* v. *Hovey,* 30 Hun, 354; *Boyd* v. *Boyd,* 130 App. Div. 161; *Brown* v. *Newell,* 132 App. Div. 548.) Retraction is not newly-discovered evidence, inasmuch as it merely tends to impeach or to contradict the witness. (*People* v. *Priori,* 164 N. Y. 469; *People* v. *Patrick,* 182 N. Y. 131; *People* v. *Eng Hing,* 212 N. Y. 373; *People* v. *Becker,* 215 N. Y. 126.) The so-called newly-discovered evidence is in no sense newly discovered within the meaning of the Code of Criminal Procedure (§ 465.

subd. 7).   Defendant knew of it all the time and willfully concealed it from his attorneys in order that he might be able to make a defense of shammed insanity. (*Quimbo Appo* v. *People*, 20 N. Y. 531; *People* v. *Becker*, 91 Misc. Rep. 329.)

CARDOZO, J.   In September, 1913, the dismembered body of Anna Aumuller was found in the Hudson river. Suspicion pointed to the defendant.   He was arrested, and confessed that he had killed the woman by cutting her throat with a knife.   He repeated this confession again and again.   He attempted, however, to escape the penalty for murder by the plea that he was insane.   He told the physicians who examined him that he had heard the voice of God calling upon him to kill the woman as a sacrifice and atonement.   He confessed to a life of unspeakable excesses and hideous crimes, broken, he said, by spells of religious ecstacy and exaltation.   In one of these moments, believing himself, he tells us, in the visible presence of God, he committed this fearful crime.   Two physicians of experience, accepting as true his statement that he was overpowered by this delusion, expressed the opinion that he was insane.   Other physicians of experience held the view that his delusion was feigned, and his insanity a sham.   The jury accepted this latter view, and by their verdict found him guilty of murder in the first degree.

The defendant was condemned to death in February, 1914.   In July, 1914, he made a motion for a new trial on the ground of newly-discovered evidence.   In his affidavit, upon that motion, he tells a most extraordinary tale.   He now says that he did not murder Anna Aumuller, and that his confession of guilt was false.   He says that she died from a criminal operation, and that to conceal the abortion, to which he and others were parties, he hacked the dead body to pieces, and cast the fragments in the river.   His crime, he now says, was not murder,

but manslaughter. He tells us why he chose to charge himself with the graver offense. He believed that he could feign insanity successfully, and that after a brief term in an asylum he would again be set at large. To confess to the abortion would implicate his confederates, and bring certain punishment to every one. To confess to murder, but at the same time feign insanity, might permit every one to go free. The compact was then made, he says, between himself and his confederates, that he would protect them from suspicion, and play the madman himself. The men and the woman who are said to have been the confederates, deny that such a compact was made. Whether they were parties or not to the fraud upon the court is of little moment at this time; in any event, the defendant now tells us that he was sane; that the tale which he told the physicians, the tale of monstrous perversions and delusions, was false; and that he did not hear the divine voice calling him to sacrifice and to slay. He asks that he be given another opportunity to put before a jury the true narrative of the crime.

There is no power in any court to grant a new trial upon that ground. The statute says that a new trial may be granted " when it is made to appear, by affidavit, that upon another trial, the defendant can produce evidence such as if before received would probably have changed the verdict; if such evidence has been discovered since the trial, is not cumulative; and the failure to produce it on the trial was not owing to want of diligence " (Code Crim. Pro. § 465, subd. 7). The power to order a new trial in criminal causes is created and measured by the statute (*People ex rel. Jerome* v. *Court of Gen'l Sessions,* 112 App. Div. 424; 185 N. Y. 504; *People* v. *Hovey,* 30 Hun, 354; 93 N. Y. 651; 1 N. Y. Crim. Rep. 477, 479; *Quimbo Appo* v. *People,* 20 N. Y. 531). The defense now offered by the defendant was not " discovered since the trial." It was known to him, on his own showing, from the beginning. He chose to withhold it,

because he had faith in his ability to deceive the courts
of justice. We do not attempt to determine how much
of his present tale is true. Even if the entire tale is
true, the courts are powerless to help him. A criminal
may not experiment with one defense, and then when it
fails him, invoke the aid of the law which he has flouted,
to experiment with another defense, held in reserve for
that emergency. It would be strange if any system of
law were thus to invite contempt of its authority. The
statute withholds that power from us, if we were other-
wise disposed to exercise it (Code Crim. Pro. § 465, subd.
7). The remedy and the one remedy available to a crimi-
nal who finds himself thus enmeshed in a trap of his own
making, is not in the processes of courts or the machinery
of law; it is by appeal to the clemency of the Governor.
Strange to say, with all its incongruous features, the
defendant's tale supplies a plausible explanation of some
of the mysteries of this tragedy. We do not mean to
express a belief that the tale is true. All that we say
is that in an appropriate proceeding it would merit
earnest scrutiny. We do not doubt that such scrutiny will
be given to it, and that right will be done, if hereafter
an appeal for clemency is made to the Executive.

The defendant shifts his ground, however, and insists
that even though his motion for a new trial was properly
denied, we must none the less reverse the judgment for
error in the charge. The error is said to have been com-
mitted in the definition of the degree of insanity that
relieves from responsibility for crime. The rule of our
statute is that "a person is not excused from criminal
liability as an idiot, imbecile, lunatic or insane per-
son, except upon proof that, at the time of committing
the alleged criminal act, he was laboring under such a
defect of reason as: (1) not to know the nature and
quality of the act he was doing; or (2) not to know that
the act was wrong" (Penal Law, § 1120). The learned
trial judge said to the jury that "wrong" in this defi-

nition means " contrary to the law of the state." The jury was instructed in pointed and impressive terms, that even if the defendant believed in good faith that God had appeared to him and commanded the sacrifice of Anna Aumuller, and this belief was a delusion, the result of a defect of reason, the defendant must none the less answer to the law if he knew the nature and quality of the act, and knew that it was wrong, in the sense that it was forbidden by the law of the state. We think that is the fair meaning of the whole charge as the jury must have understood it. For brevity, we quote its substance rather than its exact language. It is true that adopting with a proviso a request of the defendant's counsel, the court did say that " if the jury believe that at the time of the commission of the act, the defendant was completely obsessed by the delusion that he was acting under a divine command and that every other thought was excluded from his mind at the time, they must acquit the defendant, provided that the jury are satisfied that at the time he committed that act he was laboring under such a defect of reason as either not to know the nature and quality of the act he was committing or that it was wrong." This left the meaning of the word " wrong " still obscure, and the judge had already told the jury that it meant an offense against the law of the state. If, however, the jury could have supposed that he intended to modify his previous instructions, that belief must have been dispelled by the instructions that immediately followed. The counsel for the People said: " The only matter I would ask your Honor to charge again to the jury is based on the last request of the defendant, that the term ' wrong ' as used in your Honor's charge, means ' wrong according to the law of the state of New York,' " and to this the court responded: " I so charge you, gentlemen." The defendant saved his rights by appropriate exceptions.

We are unable to accept the view that the word

" wrong " in the statutory definition is to receive so narrow a construction. We must interpret the rule in the light of its history. That history has been often sketched. In the beginning of our law the madman charged with murder was not acquitted. A special verdict was given that he was mad, and then the king pardoned him (Stephen, History Criminal Law, vol. 2, p. 151; Pollock & Maitland's History of Law, vol. 2, p. 478; 3 Holdsworth, History English Law, 395, 396). There was the same need of the royal pardon for homicide by misadventure or in self-defense (Stephen, *supra*). " The man who commits homicide by misadventure or self defense deserves but needs a pardon " (Pollock & Maitland's History of Law, vol. 2, p. 477). " If the justices have before them a man who, as a verdict declares, has done a deed of this kind, they do not acquit him, nor can they pardon him, they bid him hope for the king's mercy " (Ibid, p. 477). Then came the age of what has become known as the " wild beast test." The law of that age and of later days has been adequately stated by Judge DOE in *State* v. *Pike* (49 N. H. 399) and by Judge LADD, writing for the same court, in *State* v. *Jones* (50 N. H. 369). " The defendant was not excused unless he was totally deprived of his reason, understanding and memory, and did not know what he was doing any more than a wild beast " (*Arnold's Case,* 16 Howell's State Trials, 764). As late as 1800, in *Hadfield's Case* (27 St. Tr. 1288), that test was announced as law. The first departure from the ancient rule came in 1812 (*Parke's Case,* Collinson on Lunacy, p. 477; *Broler's Case,* Id. p. 673; *Bellingham's Case,* Id. p. 636). The capacity to distinguish right from wrong was then put forward as another test. As propounded in these cases, it meant a capacity to distinguish right from wrong, not with reference to the particular act, but generally or in the abstract. Sometimes it was spoken of as a capacity to distinguish between " good and evil " (*Bellingham's Case, supra.* See also:

*Comm.* v. *Winnemore*, 1 Brewster [Pa.], 356; *Matter of Ball*, 2 City H. Rec. 85). Wrong was conceived of as synonymous not with legal but rather with moral wrong. Lord Mansfield told the jury in *Bellingham's* case: "It must be proved beyond all doubt that at the time he committed the atrocious act, he did not consider that murder was a crime against the laws of God and nature." That became for many years the classic definition. It was followed by Lord Lyndhurst in *Reg.* v. *Oxford* (9 C. & P. 533). Its phraseology, as we shall see, has survived with little variation in charges and opinions of our own day.

Then in 1843 came the famous decision of the House of Lords in *M'Naghten's Case* (10 Cl. & F. 200). It is idle to look to this decision for precise and scientific statement. The judges passed, not on a concrete case, but on hypothetical questions addressed to them by the lords. Five questions were answered, of which three only are material for present purposes. The second and third questions, which were answered together, were:

"What are the proper questions to be submitted to the jury, where a person alleged to be afflicted with insane delusion respecting one or more particular subjects or persons, is charged with the commission of a crime (murder, for example), and insanity is set up as a defense?" and

"In what terms ought the question to be left to the jury, as to the prisoner's state of mind at the time when the act was committed ?"

To this the judges responded (p. 210) "that the jurors ought to be told in all cases that every man is to be presumed to be sane, and to possess a sufficient degree of reason to be responsible for his crimes, until the contrary be proved to their satisfaction; and that to establish a defense on the ground of insanity, it must be clearly proved that, at the time of committing the act, the accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was

doing, or, if he did know it, that he did not know he was doing what was wrong. The mode of putting the latter part of the question to the jury on these occasions has generally been, whether the accused at the time of doing the act knew the difference between right and wrong; which mode, though rarely, if ever, leading to any mistake with the jury, is not, as we conceive, so accurate when put generally and in the abstract, as when put with reference to the party's knowledge of right and wrong, in respect to the very act with which he is charged. If the question were to be put as to the knowledge of the accused solely and exclusively with reference to the law of the land, it might tend to confound the jury, by inducing them to believe that an actual knowledge of the law of the land was essential in order to lead to a conviction; whereas, the law is administered upon the principle that every one must be taken conclusively to know it, without proof that he does know it. If the accused was conscious that the act was one that he ought not to do, and if that act was at the same time contrary to the law of the land, he is punishable; and the usual course, therefore, has been to leave the question to the jury, whether the party accused had a sufficient degree of reason to know that he was doing an act that was wrong; and this course we think is correct, accompanied with such observations and explanations as the circumstances of each particular case may require."

The definition here propounded is the one that has been carried forward into our statute. The judges expressly held that a defendant who knew nothing of the law would none the less be responsible if he knew that the act was wrong, by which, therefore, they must have meant, if he knew that it was morally wrong. Whether he would also be responsible if he knew that it was against the law, but did not know it to be morally wrong, is a question that was not considered. In most cases, of course, knowledge that an act is illegal will justify the

inference of knowledge that it is wrong. But none the less it is the knowledge of wrong, conceived of as moral wrong, that seems to have been established by that decision as the controlling test. That must certainly have been the test under the older law when the capacity to distinguish between right and wrong imported a capacity to distinguish between good and evil as abstract qualities. There is nothing to justify the belief that the words right and wrong, when they became limited by *M'Naghten's* case to the right and wrong of the particular act, cast off their meaning as terms of morals, and became terms of pure legality.

Another answer in *M'Naghten's* case, the answer to the first question, is yet to be considered. That question was:

"What is the law respecting alleged crimes committed by persons afflicted with insane delusion in respect of one or more particular subjects or persons; as, for instance, where, at the time of the commission of the alleged crime, the accused knew he was acting contrary to law, but did the act complained of with a view, under the influence of insane delusion, of redressing or revenging some supposed grievance or injury, or of producing some supposed public benefit ?"

And to this the answer was:

"Assuming that your Lordships' inquiries are confined to those persons who labour under such partial delusions only, *and are not in other respects insane*, we are of opinion that notwithstanding the accused did the act complained of with a view, under the influence of insane delusion, of redressing or revenging some supposed grievance or injury, or of producing some public benefit, he is nevertheless punishable, according to the nature of the crime committed, if he knew at the time of committing such crime that he was acting contrary to law, by which expression we understand your Lordships to mean the law of the land."

Many judges have pointed out that this answer introduces " an entirely new element " (LADD, J., in *State v. Jones, supra;* Maudsley, Responsibility in Mental Disease, p. 105). " How," it is asked (*State v. Jones, supra*) " are these two rules to be reconciled ? It would seem to be plain that they are in hopeless conflict and cannot both stand." (See also: 2 Stephen, History Criminal Law, pp. 154, 159, 160, 163). It is not the answer to the first question, but the answer to the second and third, that has become embodied in our statute. In case of conflict, therefore, the first answer must give way. But the truth, we think, is that the conflict is more apparent than real. The answer to the first question, though it seems to make the knowledge of the law a test, presupposes the offender's capacity to understand that violation of the law is wrong. It applies only to persons who " are not in other respects insane." We must interpret the answer in the light of the assumptions of the question. A delusion that some supposed grievance or injury will be redressed, or some public benefit attained, has no such effect in obscuring moral distinctions as a delusion that God himself has issued a command. The one delusion is consistent with knowledge that the act is a moral wrong, the other is not. " The questions are so general in their terms, and the answers follow the words of the question so closely, that they leave untouched every state of facts which, though included under the general words of the questions, can nevertheless be distinguished from them by circumstances which the House of Lords did not take into account in framing the questions " (2 Stephen, History Criminal Law, p. 154). The real point of the inquiry was whether a defendant who knew that the act was wrong, was excused because he had an insane belief that either personal or public good would be promoted by the deed. There was no thought of any conflict between the commands of law and morals.

We have still another guide to help us to a sound con-

struction of *M'Naghten's* case ánd of the statutory rule
derived from it.    That guide is found in the practice
of judges by whom the decision has been applied.    We
refer to a few instances among many.    In *R.* v. *Town-
ley* (3 F. & F. 839) Martin, B., left it to the jury to
say whether the prisoner knew that the act was " con-
trary to the law of God and punishable by the law of the
land."    In *R.* v. *Layton* (4 Cox C. C. 149) Rolfe, B.,
said that the jury must determine whether the prisoner's
delusion "had the effect of making him incapable of
understanding the wickedness of murdering his wife"
(See also: *R.* v. *Law,* 2 F. & F. 836).    In many cases,
both in our own courts and in those of sister states, the
language of Lord Mansfield in *Bellingham's Case*
(*supra*) is adopted with trifling changes, and the test is
said to be whether the defendant understood that the act
was forbidden "by the laws of God and man" (*People*
v. *Waltz,* 50 How. Pr. 204, 232; *People* v. *Pine,* 2 Barb.
566, 570; *Casey* v. *People,* 31 Hun, 158, 161).    In *Comm.*
v. *Rogers* (7 Metc. 500) Shaw, Ch. J., in expounding the
rule, assumed for illustration an insane delusion that God
had commanded a crime.    He told the jury that a defend-
ant, to be responsible, "must have sufficient power of
memory to recollect the relation in which he stands to
others, and in which others stand to him; that the act he
is doing is contrary to the plain dictates of justice and
right, injurious to others, and a violation of the dictates
of duty;" and then to explain the delusions that will
relieve a man from criminal liability, he said: "A com-
mon instance is where he fully believes that the act he is
doing is done by the immediate command of God, and he
acts under the delusive but sincere belief that what he
is doing is by the command of a superior power, which
supersedes all human laws, and the laws of nature."
In *Guiteau's Case* (10 Fed. Rep. 161) these words were
quoted approvingly, and supplemented by other illustra-
tions.    The court instanced the case of a man known to be

an affectionate father, who "insists that the Almighty has appeared to him, and commanded him to sacrifice his child." Of these and like cases, the court said (p. 182): "If a man insanely believes that he has a command from the Almighty to kill, it is difficult to understand how such a man *can* know that it is wrong for him to do it." Such a man is no less insane because he knows that murder is prohibited by human law. Indeed, it may emphasize his insanity that, knowing the human law, he believes that he is acting under the direct command of God.

Cases may be found where, in explaining what is meant by knowledge that an act is wrong, the courts have blended the elements of legal and moral wrong, but none, we believe, can be found in which the element of moral wrong has been excluded. Thus, in *Willis* v. *People* (32 N. Y. 715) the trial judge had charged the jury that the defendant must have known that the act was a violation of law and wrong in itself. There was no question in that case of an insane belief that God had commanded the defendant to override the law. This court held that the charge was sufficiently accurate, but said that it would have been more precise and discriminating to have charged that the defendant must have known that the act was "unlawful and morally wrong." In *Moett* v. *People* (85 N. Y. 373) the decision was that where the trial judge had laid down the test of criminal responsibility in the language of the statute, it was not error to refuse to amplify the charge by expounding to the jury the meaning of the word "wrong." That decision would be applicable here if the trial judge had limited himself to the statutory definition. The difficulty is that he went beyond the definition, and undertook of his own motion to explain what is meant by knowledge that an act is wrong. A remark of this court in the *Moett* case is quoted by the People as sustaining the charge, but we think it fails of that effect. The remark which they quote is this: "When it is said that a prisoner must, at the time of the alleged crim-

inal act, have sufficient capacity to distinguish between right and wrong with respect to such act, it is implied that he must have sufficient capacity to know whether such act is in violation of the law of God, or of the land, or of both." (p. 380.) But no question of any conflict in the mind of the prisoner between the law of God and man was involved in that case; and nothing that was said can be deemed to have adjudged the rule of liability, where, because of an insane delusion, such a conflict has arisen. To the reported cases in which the word "wrong" in the statutory definition has been used as importing a moral wrong, there may be added a multitude of unreported cases. As an illustration we may refer to a case recently decided by this court (*People* v. *Purcell,* 214 N. Y. 693). There the trial judge (NOTT, J.) in a careful and able charge told the jury that knowledge of the nature and quality of the act, has reference to its physical nature and quality, and that knowledge that it is wrong refers to its moral side; that to know that the act is wrong, the defendant must know that it is "contrary to law, and contrary to the accepted standards of morality;" and then he added, with a slight variation of the words of Lord MANSFIELD, that it must be known to be "contrary to the laws of God and man."

In the light of all these precedents, it is impossible, we think, to say that there is any decisive adjudication which limits the word "wrong" in the statutory definition to legal as opposed to moral wrong. The trend of the decisions is indeed the other way. The utmost that can be said is that the question is still an open one. We must, therefore, give that construction to the statute which seems to us most consonant with reason and justice. The definition of insanity established by the statute as sufficient to relieve from criminal liability, has been often and harshly criticized (see, *e. g., State* v. *Pike, supra ; State* v. *Jones, supra ; Parsons* v. *State,* 81 Ala. 577). Some states reject it altogether (*Parsons* v. *State,*

1915.]                    Opinion, per CARDOZO, J.              [216 N. Y.]

*supra,* and cases there cited). A recent case in Massachusetts (*Comm.* v. *Cooper,* 219 Mass. 1, 5) says that an offender is not responsible if he was "so mentally diseased that he felt impelled to act by a power which overcame his reason and judgment and to him was irresistible." That is not the test with us (*Flanagan* v. *People,* 52 N. Y. 467; *People* v. *Taylor,* 138 N. Y. 398; Penal Law, § 34). Whatever the views of alienists and jurists may be, the test in this state is prescribed by statute, and there can be no other (*People* v. *Silverman,* 181 N. Y. 235, 240). We must not, however, exaggerate the rigor of the rule by giving the word "wrong" a strained interpretation, at war with its broad and primary meaning, and least of all, if in so doing, we rob the rule of all relation to the mental health and true capacity of the criminal. The interpretation placed upon the statute by the trial judge may be tested by its consequences. A mother kills her infant child to whom she has been devotedly attached. She knows the nature and quality of the act; she knows that the law condemns it; but she is inspired by an insane delusion that God has appeared to her and ordained the sacrifice. It seems a mockery to say that, within the meaning of the statute, she knows that the act is wrong. If the definition propounded by the trial judge is right, it would be the duty of a jury to hold her responsible for the crime. We find nothing either in the history of the rule, or in its reason and purpose, or in judicial exposition of its meaning, to justify a conclusion so abhorrent. No jury would be likely to find a defendant responsible in such a case, whatever a judge might tell them. But we cannot bring ourselves to believe that in declining to yield to such a construction of the statute, they would violate the law.

We hold, therefore, that there are times and circumstances in which the word "wrong" as used in the statutory test of responsibility ought not to be limited to legal wrong. A great master of the theory and practice of the

criminal law, Sir James Fitz-James Stephen, in his General View of the Criminal Law of England (pages 79, 80), casts the weight of his learning and experience in favor of that view (See also: 2 Stephen, History Criminal Law, p. 168). Knowledge that an act is forbidden by law will in most cases permit the inference of knowledge that, according to the accepted standards of mankind, it is also condemned as an offense against good morals. Obedience to the law is itself a moral duty. If, however, there is an insane delusion that God has appeared to the defendant and ordained the commission of a crime, we think it cannot be said of the offender that he knows the act to be wrong. It is not enough, to relieve from criminal liability, that the prisoner is morally depraved (Wharton Criminal Law [11th ed.], § 63). It is not enough that he has views of right and wrong at variance with those that find expression in the law. The variance must have its origin in some disease of the mind (*People* v. *Carlin*, 194 N. Y. 448, 455). The anarchist is not at liberty to break the law because he reasons that all government is wrong. The devotee of a religious cult that enjoins polygamy or human sacrifice as a duty is not thereby relieved from responsibility before the law (*Guiteau's Case*, 10 Fed. Rep. 161, 175, 177; *Parsons* v. *State*, 81 Ala. 577 at 594; *Reynolds* v. *U. S.*, 98 U. S. 145; *People ex rel. Hegeman* v. *Corrigan*, 195 N. Y. 1, 13). In such cases the belief, however false according to our own standards, is not the product of disease. Cases will doubtless arise where criminals will take shelter behind a professed belief that their crime was ordained by God, just as this defendant attempted to shelter himself behind that belief. We can safely leave such fabrications to the common sense of juries.

We have considered the charge of the trial judge upon the subject of insanity, because the question is in the case, and the true rule on a subject so important ought not to be left in doubt. But, even though we hold that

there was error in the charge, we think the error does not require us to disturb the judgment of conviction. It is of no importance now whether the trial judge charged the jury correctly upon the question of insanity, because in the record before us the defendant himself concedes that he is sane, and that everything which he said to the contrary was a fraud upon the court. It is of no importance now whether the defendant would be relieved of guilt if his diseased mind had revealed the divine presence to his eyes and the divine command to his ears, because he tells us that he never saw the vision and never heard the command. He concedes, therefore, that the issue of his sanity was correctly determined by the jury; he concedes that even if there was error in the definition of insanity no injustice has resulted; and his position is that having fabricated a defense of insanity in order to deceive the trial court, it is now the duty of another court to give him a new trial because his fabricated defense was imperfectly expounded.

The law does not force its ministers of justice to abet a criminal project to set the law at naught. This court is a court of review, and cannot, of course, go beyond the record, but the confession that the defense of insanity was fabricated is part of the record (*People* v. *Priori*, 163 N. Y. 99), and the defendant himself has invited us to consider it as a basis for our judicial action. The principle is fundamental that no man shall be permitted to profit by his own wrong. It enters, by implication, into all contracts and all laws (*Riggs* v. *Palmer*, 115 N. Y. 506). We cannot ignore it in the application of a statute which commands us to do justice without reference to technical defects (Code Crim. Pro. § 542). We cannot listen to a claim of error which is conceded to have no relation to anything except a fraudulent defense. The refusal to give ear to such a claim does not need the sanction of express statute. The power is implied in the very function of courts of justice.

We hold, therefore, that the defendant has forfeited the right to avail himself of the error in the charge. There is nothing to show that he is mentally incompetent to conduct the appeal, to advise with counsel, or to understand the meaning and the consequences of his own affidavit. If that is his state of mind, if the confession is only another manifestation of disease, the law provides a remedy (*People* v. *Skwirsky*, 213 N. Y. 151). The court would then refuse to hear the appeal at all until the defendant regained his sanity. Such a state, if it exists, must be proved; it is not to be presumed. The defendant's counsel has no misgivings on the subject. On the contrary, he expressly conceded the defendant's sanity both in his printed brief and in his oral argument. In such a situation we must take the defendant at his word. It is argued that we ought not to accept his statement that his defense of insanity was a sham, and reject his statement in the same affidavit that the victim died from a criminal operation. But that is not an accurate description of our attitude. We neither accept nor reject the defendant's present statement of his participation in the crime. We merely say that if it is true, it does not make out a case of newly-discovered evidence. We find the statement coupled with a confession that the defense of insanity was a fraud upon the court; and we hold that while that confession remains before us, the defendant who made it, who still adheres to it, and who must be presumed to have sufficient mind to be responsible for it, will not be suffered by a court of justice to take advantage of his wrong.

In thus holding we do not overlook the rule that " a conviction shall not be had upon a plea of guilty where the crime charged is or may be punishable by death" (Code Crim. Pro. § 332). The defendant's counsel invokes the protection of that statute, but we think it has no application to the case before us. The defendant has not been convicted upon a plea of guilty. He has been tried

before a duly organized court (*Cancemi* v. *People*, 18 N. Y. 128); and even though there may have been error, there has been no denial in any fundamental sense of due process of law. After conviction upon such a trial, we think that the requirements of that statute have been satisfied. The defendant was not compelled by law to appeal at all; and as he had the right, at his pleasure, to forego the privilege of an appeal, so also he had the right to limit the scope and effect of his appeal. In jurisdictions where the statute is silent, a plea of guilty is allowable though the punishment is death (*Opinion of Justices*, 9 Allen, 585; *Green* v. *Comm.*, 12 Allen, 155). Even where the law forbids such a plea, there are many rights which a defendant may still renounce upon his trial (*Pierson* v. *People*, 79 N. Y. 424, 429; *People* v. *Guidici*, 100 N. Y. 503, 508). If he may renounce them upon the trial, he may renounce them upon appeal. We cannot extend the statute to the situation now before us, and we will not aid the defendant in his effort to gain the benefit of a fraudulent defense.

The judgment of conviction should be affirmed.

HISCOCK, CHASE, CUDDEBACK, HOGAN and POUND, JJ., concur; WILLARD BARTLETT, Ch. J., concurs in result.

Judgment of conviction affirmed.