## PEOPLE v. STIELOW.

(Supreme Court, Special Term, Erie County. July 30, 1916.)

1. CRIMINAL LAW ⬅➡938(1)—NEW TRIAL—NEWLY DISCOVERED EVIDENCE.

The power of the court to award a new trial in criminal cases, on the ground of newly discovered evidence, is created and measured by the statute, Code Cr. Proc. § 465, subd. 7; the power not having existed prior to its enactment.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2306, 2312, 2313, 2315, 2317; Dec. Dig. ⬅➡938(1).]

2. CRIMINAL LAW ⬅➡940—EVIDENCE—HEARSAY.

An affidavit of a private detective, supporting a motion for new trial on the ground of newly discovered evidence of one convicted of murder in the first degree, to the effect that he went to the scene of the crime with a resident of the community, who told him there was a double murder committed there, and that the next morning defendant came over, and, seeing that the murdered man was still alive, cut a stick and hit him twice on the head so that he could not tell any one who committed

the murder, and that a neighbor said that a man named J. committed the murder, etc., was incompetent as hearsay.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2324–2327; Dec. Dig. ☞940.]

3. CRIMINAL LAW ☞940—EVIDENCE—HEARSAY.

An affidavit, in support of motion for new trial on the ground of newly discovered evidence of one convicted of murder in the first degree, to the effect that a woman said her husband said he saw two men coming from the direction of the scene of the crime, following the firing of shots and screaming, etc., was incompetent as hearsay.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2324–2327; Dec. Dig. ☞940.]

4. CRIMINAL LAW ☞938(1)—NEW TRIAL—AFFIDAVIT SUPPORTING MOTION—STATUTE.

Affidavit, in support of a motion for new trial of one convicted of murder in the first degree, concerning the mental capacity of defendant, did not satisfy the requirements of Code Cr. Proc. § 465, subd. 7, the evidence not being newly discovered and being also cumulative.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2306, 2312, 2313, 2315, 2317; Dec. Dig. ☞938(1).]

5. CRIMINAL LAW ☞940—NEW TRIAL—NEGATIVE AFFIDAVITS.

Affidavits, in support of a motion for new trial of one convicted of murder in the first degree, to the effect that a bloodhound paid no attention to defendant, who wore felt boots at the time, was purely negative and immaterial.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2324–2327; Dec. Dig. ☞940.]

6. CRIMINAL LAW ☞940—NEW TRIAL—AFFIDAVIT—RELEVANCY.

An affidavit of a Bertillion operator, in support of a motion for new trial of one convicted of murder in the first degree, submitting finger prints of defendant, no photograph of the finger prints on the lamp chimney at the scene of the crime having been taken for comparison, was irrelevant.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2324–2327; Dec. Dig. ☞940.]

7. CRIMINAL LAW ☞940—EVIDENCE—HEARSAY.

An affidavit, in support of a motion for new trial on the ground of newly discovered evidence of one convicted of murder in the first degree, to the effect that affiant conducted a store some distance from the place of the crime, and that afterwards a detective came there and inquired for 22 caliber cartridges, was incompetent as hearsay.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2324–2327; Dec. Dig. ☞940.]

8. CRIMINAL LAW ☞940—EVIDENCE—HEARSAY.

Evidence by affidavit, in support of a motion for new trial on the ground of newly discovered evidence of one convicted of murder in the first degree, that a detective had told an attorney how he had intimidated defendant into confessing was hearsay, and could be used on second trial only to impeach the detective as a witness.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2324–2327; Dec. Dig. ☞940.]

9. CRIMINAL LAW ☞942(1)—NEW TRIAL—NEWLY DISCOVERED EVIDENCE—IMPEACHING OR CONTRADICTING EVIDENCE.

New trial will not be granted for newly discovered evidence only to present evidence to impeach and contradict witnesses sworn on trial.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 2331; Dec. Dig. ☞942(1).]

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**10. CRIMINAL LAW ⊂⇒945(1)—NEW TRIAL FOR NEWLY DISCOVERED EVIDENCE —DELAY IN APPLICATION.**

Where evidence, possessing inherent indications of credibility, is presented to the court, satisfying the requirements of Code Cr. Proc. § 465, subd. 7, providing when new trial may be granted for newly discovered evidence in criminal cases, it is the court's duty to grant a new trial notwithstanding delay in bringing the new matters to its attention.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2324-2327, 2336; Dec. Dig. ⊂⇒945(1).]

**11. CRIMINAL LAW ⊂⇒945(1)—NEW TRIAL—NEWLY DISCOVERED EVIDENCE— PROPRIETY OF GRANTING.**

When defendant, charged with murder in the first degree, has had a fair trial, been ably represented by counsel, and convicted on evidence leaving no doubt of his guilt, new trial should not be granted unless it clearly appears that since trial evidence has been newly discovered which would probably change the verdict, and meets the requirements of Code Cr. Proc. § 465, subd. 7, regulating when new trial may be granted for newly discovered evidence.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2324-2327, 2336; Dec. Dig. ⊂⇒945(1).]

Charles F. Stielow was convicted of murder in the first degree. On motion for new trial. Motion denied.

John C. Knickerbocker, Dist. Atty., of Albion, for the People.

David A. White, of Albion, and Stuart M. Kohn, of New York City, for defendant.

COLE, J. The defendant was convicted on July 23, 1915, of the crime of murder in the first degree. His conviction was unanimously affirmed by the Court of Appeals.[1] Thereafter, and in April of the present year, a motion was made in the Supreme Court at Special Term before Mr. Justice Wheeler for a new trial on the ground of newly discovered evidence, and a reprieve was granted for one month to enable the court to determine such application. The application was denied. The sentence was to have been executed on July 15, 1916. On July 14, 1916, a second application for a new trial on the ground of newly discovered evidence was presented to a justice of this court, and an order was on that day granted, returnable at 2 o'clock in the afternoon of the same day. Owing to the brief time permitted (less than 24 hours) for examination of the merits of the application, a reprieve was granted by the executive upon the request of this court, until the week commencing July 24th, and the defendant was permitted to serve further affidavits in support of such application. The affidavits presented in support of the application, both before and subsequent to the return of the order to show cause, will be noticed hereinafter. Before commenting upon the affidavits and in order that their application can be more readily understood, a brief synopsis of the evidence disclosed by the record is required.

On Sunday evening March 21, 1915, between 10 and 11 o'clock Charles B. Phelps, an aged farmer residing in the town of Shelby, Orleans county, and Miss Margaret Wilcott, his housekeeper, were both murdered by being shot with a revolver containing 22-caliber

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
[1] 217 N. Y. 641, 112 N. E. 1069.

cartridges and bullets. About a week prior to the murder the defendant was engaged by the deceased as a farm hand for one year, and thereupon at once moved with his family into the tenant house on the farm, nearly across the road from the residence of the deceased, where the murder was committed. Living with the defendant were his family, consisting of his wife and children, his mother-in-law, a Mrs. Green, and a brother-in-law, Nelson Green. During the week preceding the murder the deceased had drawn from a bank a substantial sum of money, and a portion thereof was in his house at the time, and robbery of this sum of money is the motive ascribed to the crime. Four pistol shots were heard by a neighbor, a Mrs. Erma Fisher, housekeeper for one Benson, and who has since married Benson. The Benson house was located some little distance from the residence of the deceased. Two of the shots were heard, and, after a brief interval, two more. Soon after the last two shots Mrs. Fisher heard screams, and then a knocking or pounding as if on a door in the locality of the Stielow house, and a woman's voice calling, "I am dying; Charlie open the door; I am dying." The next morning the defendant claims to have found Phelps lying unconscious just inside the kitchen door of the Phelps home, and Miss Wilcott dead on the front steps of the tenant house in which Stielow resided. Phelps died the afternoon of that day, March 22d. He had been shot, one bullet penetrating the heart and lungs; one penetrating the head, and one penetrating the left forearm. Miss Wilcott was shot in the breast. She and the deceased occupied the house alone prior to the murder. The defendant denied any knowledge of the affair, or that he heard any of the shots or the cries of the woman, claiming that he retired about 10 o'clock p. m., he and Nelson Green sleeping together. The defendant was the owner of a 22-caliber revolver. The bullets were extracted from both bodies, and contained certain irregularities conforming to an irregularity in the barrel of the defendant's revolver. The defendant and Nelson Green caused this revolver to be concealed soon after the murder, and both denied that the defendant owned a revolver. George W. Newton, a detective of Buffalo, was employed by the district attorney soon after the commission of the murder, and with other operatives spent much time in the vicinity of the crime, and had frequent interviews with the defendant, during all of which until the time of his arrest he denied any knowledge of or complicity in the crime. On April 21st the defendant was arrested without warrant and taken to the county jail, and was there questioned by the detective, Newton, with one of his operatives, Wilson, and J. Scott Porter, under-sheriff of the county, and on that evening he told Sheriff Bartlett that he desired to make a statement. The district attorney was notified and came, and Stielow made a lengthy statement, which was reduced to writing, in which he still denied his guilt, but told much concerning his movements on the evening of the crime, and admitted that he and his family had made false statements and had sworn falsely before the coroner. This statement the defendant swore to before a notary public. The next morning he told the sheriff voluntarily that he desired to make a further statement, and said that he would do so

the next morning, saying that he wished to see his wife first, and that he would then tell all about the murder, and said he was unable to sleep the night before, and that there was a lump in his throat. The sheriff urged him to tell the truth. The next morning, March 23d, at the sheriff's office, in the presence of the sheriff, the undersheriff, the district attorney, Mr. Newton, and Mr. Wilson (the detectives), he made a full confession, telling in great detail of the crime, and of the plans preliminary thereto between himself and Green. He claimed that he procured the revolver from his own house, gave it to Green; that the two went to the house of the deceased to rob the deceased; that Green actually did the shooting, but upon the defendant's advice. Soon thereafter, and while in jail, he said to a newspaper reporter, a Mr. Turner, that Green did the shooting, but that they talked it over together beforehand.

The trial occurred in July, 1915, and occupied ten days, many witnesses being sworn on each side. From an examination of the record it is inconceivable that the jury could have rendered any other verdict. The crime was deliberately planned by the defendant and Green, and the circumstances of its execution were revolting in their cruelty. Any other verdict would have been a miscarriage of justice. The conviction could not have been had, however, without the confession. The confession as disclosed at the trial was voluntarily made after the defendant was fully and carefully advised of his rights by the district attorney, and by him cautioned that such confession would be used against the defendant. This confession is a consistent detailed story of the preparation for, and execution of, the plot to murder Phelps for his money, which Phelps was known to have in his house, and to kill Miss Wilcott in order that there might be no witness of the crime. Many details of the confession are corroborated by other evidence in the case.

The following affidavits are submitted on this application:

(1) An affidavit of John Whiting, a private detective now employed by some one in the interest of the defendant, wherein he swears that on the 8th of July, 1916, he went to the Phelps premises with one Henry Shultz, a resident of the community, and Shultz there said to him that there was a double murder committed there, and that the next morning a fellow named Stielow came over, and, seeing that Phelps was still alive, cut a stick and hit the old man twice on the head, so that he could not tell any one who committed the murder, and that a man who lived across the road, who does not like Jenkins (another neighbor) said that Jenkins committed the murder to get Phelps' money and two farms; for Benson claims that he saw Jenkins and his hired man around the house at 11 o'clock the Sunday night of the murder, and that detective Newton tried to make Benson say that Stielow was there at the time, but Benson would not do it. That Shultz told Whiting that the old man Phelps had drawn $50,000 on the advice of his nephew Jenkins and kept it in the house, and that the neighbors said that Jenkins did it, and that he (Shultz) drove the detectives Newton and Wilson about the country 4,000 miles in connection with the case.

(2) An affidavit of Frank J. Milman, a minister of the Presbyterian Church at Medina, some miles distant, who says that a few days after the murder he was at the Benson house; that Mrs. Fisher, now Mrs. Benson, stated that on the night of the murder she was sick, and consequently up and around the house, when she heard two shots; that she called Mr. Benson, and that he opened the window to ascertain what the trouble was; and that he (Benson) saw·two men passing his house coming from the direction of the Phelps house. .

(3) An affidavit of Wallace Moon, a resident of the village of Medina, in which he swears that on the 22d of March, 1915, in the morning following the murder, he went to the Phelps house and went upstairs into the bedroom, where he noticed a bed which had evidently been slept in the night before, and on the bureau he noticed the butt of a cigar, and cigar ashes on the floor and directly beneath.

· (4) An affidavit of William Pogle, Jr., wherein he testifies that on the morning after the murder he went in company with Nelson Green to the house of the deceased, and walked into the dining room, where he saw the places where three people had eaten the evening before, as there were chairs drawn up and dishes placed on the table for three persons. That from the foregoing he concluded that there had been three people who had had supper at the Phelps home on Sunday evening March, 21, 1915.

(5) An affidavit of Garfield Vincent, wherein he swears that at the time of the murder he resided about 11 miles distant from the Phelps home, and that about 6:30 o'clock in the morning a man came along the highway, and, without stopping, inquired the way to the nearest railroad station; that the man was about 30 years of age; wore a dark suit of clothes and a cap; his face was unshaven; his clothes were bad-ly bespattered with mud, particularly his trousers below the knee.

(6) An affidavit of Frederick W. Parsons, first assistant physician at the Hudson River State Hospital for the Insane, wherein he states that he examined Charles Stielow, applying what is known as the "Binet-Simon" method, and that he finds that the intelligence of the defendant is equal to that of a child aged 7⅗ years. This affidavit was also submitted on the former motion.

(7) An·affidavit of Roy Stielow, 11 years old, son of the defendant, wherein he swears that a few days after the murder another boy, Frank Leffein, a son of William Leffein, who resides in the neighborhood of the crime, gave to deponent a number of empty shells of a 22-caliber revolver cartridges and that he carried them home from school, and, after playing with them some time, put them in the stove, and that he never told his father or any one else about it until after the trial.

(8) An affidavit of Mary Crepps that she conducted a store some distance from the place of the crime, and that after the murder, Newton came there and inquired for 22-caliber cartridges.

(9) An affidavit of the defendant, wherein he denies his guilt, and tells of his movements on the night of the murder, and swears that the confession was obtained from him by the detective Newton as a result of threats and promises and through fear. That he was completely under the domination and influence of Newton at the time when he con-

fessed, and says that he told the truth upon the witness stand. He also swears that, until he was recently told, he did not know of the facts contained in the affidavit of Newton, Pogle, and Vincent.

(10) An affidavit of Louis Powers, a Bertillion operator and finger print expert at Sing Sing Prison, in which he submits specimens of finger prints of the defendant.

(11) An affidavit of Amos C. Squire, prison physician of Sing Sing Prison, where the defendant is confined, in which he states that he has carefully read the statement, or so-called confession, of the defendant of April 23d, and that he is confident that the defendant is not mentally capable of making such a statement or of comprehending the details contained therein; that he is a man easily led by suggestion to say and do things the import of which he does not appreciate, and is the prey of any individual who has a strong domineering will.

(12) An affidavit of Thomas O'Grady, a detective of Buffalo, wherein he swears on the day following the murder he went to the scene of the crime, and went to the bedroom referred to in the affidavit of Wallace Moon, and saw that the clothes were thrown back as if some one had occupied the bed, and observed a cigar stub and ashes. There was also a kerosene oil lamp, upon the chimney of which he observed finger prints. That he requested both the sheriff and the district attorney to let him have the finger prints photographed, but did not obtain their consent. That he was present when a bloodhound was brought to be used in the case, but that the bloodhound when brought to Stielow paid no attention to him.

(13) Affidavits of Mr. White and some of the other affiants to excuse laches, and to the effect that the facts stated in the other affidavits are newly discovered.

(14) An affidavit of Nelson Green, taken at Auburn prison, where he is confined upon his plea of guilty to murder in the second degree for his connection with this crime, wherein he swears that he is not guilty, and that Stielow and he slept together on the night of the crime; that he (Green) was taken from his home by Newton to a hotel, and was told that Stielow had said that Green had killed Phelps and Miss Wilcott, and that unless he (Green) admitted it, he (Newton) would hang him up and would throw him into a box and throw away the key and let him rot; that he was afraid of Newton, and that he was taken for a long ride in an automobile, where there was a bedroom, somewhere, and there said what they wanted him to; that they kept him in jail, and that several times thereafter he told them whatever they wanted him to, and signed statements because he was afraid of them, and thought that would be his only chance to get out of the trouble, and that at the time when he pleaded guilty he did not know what they were doing to him; that his lawyer told him that "Unless you take plea to murder in the second degree, you will have to go to the electric chair; it is the only way I can save you;" that Mr. White, defendant's attorney, came to the jail a great many times after the deponent and Stielow were locked up and before the trial, and that White wanted to talk to him, but he declined to talk to him, as he thought White was working to get Stielow out and make him (Green) guilty; that all the

160 N.Y.S.—36

while he was at the jail in Albion he was afraid of the detectives and of the sheriff, and was afraid to say anything different than what he had until he got into Auburn Prison, and that he is now willing to tell the truth about it.

(15) An affidavit of Stuart H. Kohn, an attorney whose office is at 27 Cedar street, Borough of Manhattan, supported by the affidavits of James W. Carter, George A. Harkins, detectives, and Alice Navard, stenographer, wherein they testify to an interview with Newton, the detective, which was taken down in shorthand through the medium of a dictaphone at Mr. Kohn's office on July 10, 1916. In this interview, as it is disclosed by the record of the conversation, it appears that Newton was inveigled to New York City by detectives employed in the interest of the defendant to work upon a mythical case of blackmail, and that at the office of Mr. Kohn he was questioned concerning his experience and ability as a detective, and as to how he was able to get the confession of Stielow, and in that interview Newton said that after other detectives had failed, he was employed in this case and after investigating convinced himself that the defendant was the man who murdered Phelps, and that, "I worked day and night to get him;" that he got into the confidence of Stielow and saw him every day and talked with him about the case; that he finally went to Stielow, got him all excited, rushed at him, grabbed him, shook him, and threw him against the wall, and said, "Charlie, who murdered old man Phelps?" that the defendant said, "I don't know," and "I rushed at him again, grabbed him by the throat, and said "You s—— of a b——, who killed Phelps?" and Stielow again answered, "I don't know;" that he (Newton) grabbed Stielow again and took him in an automobile, brought him to his hotel, and held him there all night and told the innkeeper to go to bed, and that he with two detectives went at him "all night long with hammer and tongs," and finally told Stielow that if he would say that Green shot Phelps, he (Newton) would let him go home to his wife, who was about to be confined; that the defendant then admitted his guilt; that he (Newton) then notified the district attorney and sheriff, and before them Stielow made a full confession; that with his confession he went to Green, and that they worked the two men (Green and Stielow) one against the other, and that Green admitted that he held Phelps while the defendant shot him. Some of these affidavits have been received since the submission of the application, but, owing to the gravity of the case, I have nevertheless received them and given them careful consideration.

In the affidavits submitted by the people Mr. Newton denies much of the alleged interview with Mr. Kohn disclosed by the dictaphone record, and both he and Mr. Wilson deny the truth of the statements contained in the dictaphone record, and reiterate again what they swore to at the trial, and the circumstances under which the alleged confession was obtained.

The affidavit of Henry Shultz is submitted, in which he denies substantially all of the statements contained in the affidavit of Whiting.

Walter Williams swears in his affidavit that he went to the Phelps house the morning after the murder and went to the room upstairs

referred to in the affidavit of Wallace Moon and Thomas O'Grady, and did not notice any cigar stub or ashes on the floor, and that he observed that the clothes on the bed were thrown back over the footboard, but there was nothing to indicate when the bed had been occupied.

Ernest Garter also makes an affidavit to the same effect.

Frank Leffein denies having given a quantity of cartridges to the boy Roy Stielow.

The following affidavits are also submitted by the people, viz.: J. Scott Porter, undersheriff, Chester M. Bartlett, sheriff, John C. Knickerbocker, district attorney, Henry Shultz, Francis W. Buell, George W. Newton, and Robert C. Wilson, from which it clearly appears that Green confessed to his complicity with Stielow in the commission of the murder. He made two confessions, one on April 21, 1915, and a further confession containing some additional statements on May 15, 1915. These confessions were voluntarily made after he had been fully advised of his rights, and after being told by the district attorney that he would be prosecuted for murder, and that the confession would be used against him, and that he voluntarily stated that he knew the effect of his statement, and that it meant state's prison for life, or the electric chair. No threats were made against him at any time, and no promises were made to him. His attorney was associated as counsel with the defendant's attorney during the trial of Stielow, and his attorney proposed to the district attorney to have Green go upon the witness stand as a witness for the people and tell all about the murder, but the district attorney declined to accept his proposal, advising Green's attorney that if he desired to call Green, he could do so as a witness for the defendant.

By the provisions of section 465 of the Code of Criminal Procedure (subdivision 7) the court is empowered to grant a new trial in a criminal case—

"where it is made to appear, by affidavit, that upon another trial the defendant can produce evidence such as, if before received, would probably have changed the verdict; if such evidence has been discovered since the trial, is not cumulative; and the failure to produce it on the trial was not owing to want of diligence."

[1] Prior to the enactment of the statute now embodied in the above provision of the Code of Criminal Procedure, such power did not exist. Quimbo Appo v. People, 20 N. Y. 531; People v. Becker, 91 Misc. Rep. 329, 155 N. Y. Supp. 107; People v. Schmidt, 216 N. Y. 324–328, 110 N. E. 945, Ann. Cas. 1916A, 978. As stated in the case last cited:

"The power to award a new trial in criminal causes on the ground of newly discovered evidence is created and measured by the statute."

These various requirements must exist conjointly in order to authorize the court to grant a new trial on the ground of newly discovered evidence. People v. Moore, 29 Misc. Rep. 575, 62 N. Y. Supp. 252. The affidavits submitted in behalf of the defendant must be considered in the light of the requirements of the statute and the decisions of the courts thereunder.

[2] 1. The affidavit of John Whiting is several times hearsay, and the proof is not even competent.

[3] 2. The affidavit of Milman is subject to precisely the same criticism. *He says* that *Mrs. Benson says* that *Benson says,* he saw two men coming from the direction of Phelps' following the firing of the shots and the screaming. Benson's affidavit to that effect is not produced.

3. The affidavit of Wallace Moon, indicating that at some time the upstairs bed had been occupied (and of course he cannot tell when nor under what circumstances), and that there were cigar ashes and a cigar stub by the bed, shed no real light on the tragedy.

4. The same is true of the affidavit of William Pogle, Jr., that he observed that the table was set as if for three persons, from which he concluded that three persons had eaten there at supper the night before. The inference urged is that a third person had supper with Phelps and Miss Wilcott, went to bed, and smoked a cigar and got up early in the evening and killed Phelps and Miss Wilcott, and then left the place, or that he ate supper, committed the murder, and there went to bed and smoked a cigar, then got up and left the premises. If the affidavits of this witness and the last one are of any importance, this testimony could also readily have been discovered for use upon the former trial.

5. The affidavit of Garfield Vincent that on the next morning, 11 miles away, a stranger came along and without stopping inquired the way to the nearest railroad station possesses no probative force.

[4] 6. The affidavits of Frederick W. Parsons and Amos C. Squire, concerning the mental capacity of the defendant, satisfy none of the requirements of the statute. The evidence is not newly discovered and is cumulative. The court and jury had full opportunity to observe the defendant's mental capacity. His attorney had abundant authority to present such evidence to the jury, and abundant opportunity to urge for their consideration the defendant's mental capacity, bearing upon the probability of the confession being voluntary.

It will be observed from the record that the defendant seemed to take very good care of himself, both on direct and cross examination.

[5] 7. The affidavit of Mr. O'Grady, concerning the appearance of the bed, and of the cigar stub and ashes, is subject to the same criticism as that of Wallace Moon. O'Grady's statement about the finger prints is purely negative in its effect, for the reason that no photographs were in fact taken. The statement in his affidavit about the bloodhound paying no attention to Stielow, who wore felt boots at the time, is likewise purely negative in its effect. It proves nothing, although true.

[6] 8. The affidavit of Powers, the Bertillion operator at Sing Sing, is wholly irrelevant, no photographs of the finger prints on the lamp chimney having been taken for comparison. The same criticism applies to the affidavit of Joseph Whitwell another finger-print expert.

[7] 9. The affidavit of Mary Cripps, concerning her conversation with detective Newton, is purely hearsay and incompetent.

10. The affidavit of the defendant, of course, contains no statement

of any newly discovered fact. It relates to the identical matter to which he testified, and which was fully litigated at the trial. It meets the requirements of the statute only in so far as it denies previous knowledge of the facts stated in the other affidavits.

It will thus be seen that with the exception of the affidavit of Green and the affidavits of the interview with Newton at Mr. Kohn's office in New York, the affidavits presented establish nothing of any consequence, and fail to meet scarcely any of the requirements of the statute.

[8] It remains to consider the effect of the affidavits of Mr. Kohn and the stenographer and detectives concerning the interview with Newton at Mr. Kohn's office in New York. Much of this interview is denied in Newton's affidavits submitted by the people in opposition. I do not undertake to determine where the truth lies with respect to this interview, but shall consider the effect of this interview as if it were truly stated by Mr. Kohn and the stenographer. The inherent defect in these affidavits is that the evidence is purely hearsay. It could not be used upon another trial unless Newton were sworn, and then it could be used only to impeach him by contradicting him.

[9] It is settled by authority that a new trial will not be granted upon the ground of newly discovered evidence to present evidence which serves only to impeach or contradict witnesses sworn upon the trial. People v. Priori, 164 N. Y. 472, 58 N. E. 668; People v. Becker, 91 Misc. Rep. 329, 155 N. Y. Supp. 107; People v. Becker, 215 N. Y. 159, 160, 109 N. E. 127; People v. Eng Hing and Lee Dock, 212 N. Y. 373, 106 N. E. 96.

The story contained in the affidavit of Nelson Green is so highly improbable, even if it were not disputed, that I am impressed with its falsity. That Green confessed of his crime in all its revolting details through fear; that during the months that he was confined in jail and away from Newton he never retracted his story; that he was afraid even to tell his lawyer that the confession was untrue; that he admitted it all to the sheriff and district attorney after being fully and fairly advised of his rights, and cautioned as to the effect of his confession upon his own life, and then, still being innocent, pleaded guilty to murder in the second degree and entered upon the service of his term of life imprisonment, and apparently never retracted this story until visited in prison now by Stielow's attorney after 1 year of incarceration—is so improbable that in the opinion of the court if it had been before received it would not probably have changed the verdict. From the opposing affidavits, however, it is entirely clear that Green's affidavit in its entirety is a tissue of falsehood.

[10] If injustice were done; if evidence possessing inherent indications of credibility were presented satisfying the requirments of the statute—it would be the duty of the court, and that duty would be performed without hesitancy, to grant a new trial notwithstanding the delay in bringing the new matters to the attention of the court. But the court is not unmindful that something is due to the law and to its orderly administration.

[11] When a trial has been had in which every right of the defendant has been safeguarded by the court and by the prosecution as well, wherein the defendant has been ably and zealously represented by capable counsel, and when by the solemn judgment of the court the defendant has been convicted upon evidence which leaves no room for doubt as to his guilt, a new trial should not be granted unless it clearly appears that since the trial evidence has been newly discovered which, if before produced, would probably have changed the verdict, and which likewise meets the other requirements of the statute in question. Such a case is not presented.

The motion for a new trial is therefore denied.